**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leopold FRADE and Joe Morris Doss,
Defendants-Appellants.**

No. 82–5179.

United States Court of Appeals,
Eleventh Circuit.

July 18, 1983.
Rehearing and Rehearing En Banc
Denied Sept. 23, 1983.

Julian R. Murray, Jr., Murray, Murray, Ellis, Braden & Landry, New Orleans, La., for defendants-appellants.

W. Peter Burns, Steel, Hector & Davis, Miami, Fla., for amicus curiae presiding bishop of Episcopal Church in U.S.

Stanley Marcus, U.S. Atty., Jon May, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before VANCE and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

VANCE, Circuit Judge:

Appellants, Father Joe Morris Doss, Rector of Grace Episcopal Church in New Orleans, and Father Leopold Frade, Curate of Grace Episcopal Church and chairman of the National Commission for Hispanic Ministry at the time of the events giving rise to this appeal, appeal their convictions for violation of the Trading With the Enemy Act, 50 U.S.C., Appendix § 5(b) (1968 & Supp. 1983) (TWEA) and 31 C.F.R. § 515.415(a),[1] a regulation promulgated under section 5(b) of the Act, as an addition to the Cuban Assets Control Regulations.

The events giving rise to the convictions are those of the now famous Mariel boatlift, or freedom flotilla, of spring 1980, by which some 114,000 Cuban refugees, in nearly 1,800 boats, crossed the 90 miles of ocean and great political divide between Cuba and the United States. *See Pollgreen v. Morris,* 496 F.Supp. 1042 (S.D.Fla.1980). In early April 1980, some 10,800 Cuban citizens claiming status as political refugees sought sanctuary in the Peruvian Embassy in Havana. On April 14, 1980, President Carter declared that, pursuant to the Refugee Act of 1980, up to 3,500 of these refugees would be admitted into the United States. He allocated up to $4.25 million for their resettlement. 45 Fed.Reg. 28079 (April 28, 1980). An airlift was started, but within three days Castro stopped the flights, announcing that anyone who wanted to leave could do so through the harbor of Mariel. Almost immediately, small boats, funded by the members of the Cuban-American community, began leaving Key West.

Cuban-American parishioners of Grace Church implored Fathers Frade and Doss to help in arranging for a boat to bring their relatives from Cuba. Although the priests first considered the idea impractical they changed their minds because their parishioners, like other Cuban-Americans, were paying extortionate prices to cross the Florida Straits in small, unsafe boats, only to find, upon arriving in Mariel, that they were forced to return with criminals, the mentally ill, and other undesirables, rather than the relatives for whom they had come. Frade and Doss recognized they could avoid these problems by chartering a large, safe

---

1. 31 C.F.R. 515.415(a) states:

 The following transactions are prohibited by § 515.201 when in connection with the transportation of any Cuban national, except a Cuban national holding an unexpired immigrant or non-immigrant visa or a returning resident of the United States, from Cuba to the United States, unless otherwise licensed:

 (1) Transactions incident to travel to, from, or within Cuba;

 (2) The transportation to Cuba of a vessel or aircraft;

 (3) The transportation into the United States of any vessel or aircraft which has been in Cuba since the effective date, regardless of registry;

 (4) The provision of any services to a Cuban national, regardless of whether any consideration for such services is furnished by the Cuban national;

 (5) The transportation or importation of baggage or other property of a Cuban national;

 (6) The transfer of funds or other property to any person where such transfer involves the provision of services to a Cuban national or the transportation or importation of, or any transactions involving, property in which Cuba or any Cuban national has any interest, including baggage or other such property;

 (7) Any other transactions such as payment of port fees and charges in Cuba and payment for fuel, meals, lodging; and

 (8) The receipt or acceptance of any gratuity, grant, or support in the form of meals, lodging, fuel, payments of travel or maintenance expenses, or otherwise, in connection with travel to or from Cuba or travel or maintenance within Cuba.

vessel at an affordable per-passenger price. Because Father Frade had previously dealt directly with Cuban officials through his participating in the Cuban Political Prisoner Program, sponsored by the Episcopal Church and arranged in coordination with the Immigration and Naturalization Service and United States Customs, he believed he could negotiate an agreement which would avoid their returning with undesirables.

A meeting, held by the priests at Grace Church on May 3 to organize the rescue mission, was attended by 650 people and met with immediate overwhelming response. Based on the cost estimates for the boat, Frade and Doss had requested $800 per passenger. Within forty-eight hours, the necessary minimum of $170,000 was collected. Eventually $215,000 was raised. The priests told the subscribers that they could not guarantee that anyone would be brought back or any money refunded.

On May 7, 1980, Frade and Doss negotiated with the Cuban Interest Section at the Czechoslovakian Embassy in Washington. They obtained assurances that they would not be forced to bring back undesirables, and would receive a favorable ratio of persons on their list to ex-political prisoners selected by the Cuban government. The Cuban Interest Section insisted, as part of the Cuban government commitment, that Frade and Doss turn over the list of the people they proposed to pick up. On May 9, 1980, the priests submitted a list of 260 names which were immediately telexed to Havana. An additional 106 names were telexed on May 11.

Although the priests understood that, in the week following their meeting at the Cuban Interest Section, Administration attitude towards the boatlift had changed, they realized that, once the names had been telexed, they had passed the point of no return. Father Frade had been told by a Cuban official, during his last refugee flight to Cuba on May 5, that a "national purge was taking place," those applying for permission to leave Cuba were losing jobs, houses, and ration cards, and sometimes being attacked, beaten and killed. Trial witnesses testified to the vengeful and bloody "repudiation meetings" which were

arranged for would-be emigres. As the district judge observed at sentence "[O]nce the list of names had been given over to the Cuba officials . . . it would have been very difficult, a very difficult decision of conscience to stop at that time."

On May 26, 1980, the *God's Mercy*, a large, safe vessel, equipped with $10,000 in added safety equipment, and manned by an experienced crew, including a doctor and a nurse, set sail for Mariel. Frade and Doss, realizing that they would be unable to make a return trip, flew to Havana to renegotiate for an improved ratio of persons on their lists. After two weeks of intense negotiation, over the dinners demanded by the Cuban officials at "mind-blowing" expense, they succeeded. On June 12, 1980, the *God's Mercy* arrived in Key West, with the priests and 402 refugees including 288 persons from the lists.

The *God's Mercy* was escorted into Key West by two Coast Guard cutters. Frade and Doss were arrested immediately. Father Frade received $431,000 in civil fines and the *God's Mercy* was forfeited to the government.

The priests were first indicted under 8 U.S.C. § 1324(a)(1) (Supp.1982) for transporting and landing illegal aliens and conspiracy to commit the same offense. The district court, sitting en banc, dismissed the indictment, finding an absence of the "fraudulent, evasive, or surreptitious" entry required for a violation of 8 U.S.C. § 1324(a)(1). *United States v. Anaya,* 509 F.Supp. 289, 297 (S.D.Fla.1980). This court affirmed the dismissal, holding on the stipulated facts that the transportation of aliens for purposes of their seeking lawful entry into the United States did not constitute general criminal intent to violate the statute. *United States v. Zayas-Morales,* 685 F.2d 1272, 1275 (11th Cir.1982). Only after the charges against the priests were dismissed by the district court did the government bring an indictment against them under the TWEA.

## THE ISSUE OF CRIMINAL INTENT

■ Appellants contend that the trial court erred in denying their motion for

judgment of acquittal and alternative motion for a new trial on the grounds that there was no evidence to establish the requisite criminal intent to violate the TWEA. To be criminal, violation of regulations promulgated pursuant to the TWEA must be willful. *McGrath v. Manufacturers Trust Co.,* 338 U.S. 241, 247, 248, 70 S.Ct. 4, 7, 8, 94 L.Ed. 31 (1949). 50 U.S.C., Appendix § 16 (Supp.1983), which defines the punishment for violations of the TWEA, states in pertinent part:

> Whoever shall willfully violate any of the provisions of this Act ... or of any ... rule, or regulation issued thereunder ... or refuse to comply with any order of the President issued in compliance with the provisions of this Act shall, upon conviction, be fined not more than $50,000 or, if a natural person, imprisoned for not more than ten years, or both.[2]

(parenthetical omitted).

When used in a criminal statute "the word 'willfully' ... generally connotes a voluntary, intentional violation of a known legal duty." *United States v. Bishop,* 412 U.S. 346, 360, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973). *Accord United States v. Hernandez,* 662 F.2d 289, 292 (5th Cir.1981); *United States v. Davis,* 583 F.2d 190, 193 (5th Cir.1978).

The regulation under which the priests were convicted, 31 C.F.R. § 515.415, was quietly promulgated, unexpected, and unannounced on May 15, 1980—after the list of names had been tendered to Cuba. It criminalized behavior (travel to, from, and within Cuba), which previously had been expressly authorized in published regulation 31 C.F.R. § 515.560,[3] and which, in fact, remained lawful, except when done in connection with the transportation of Cuban nationals, an activity which also is not generally criminal. It penalized the paying of port fees in a foreign harbor and duly incurred hotel, motel and restaurant bills—activities which laymen do not consider wrong

---

2. Actually, apparently as the result of harmless error, the priests were indicted under the old section 5(b)(3) of the Trading With the Enemy Act which contained substantially identical language, except that the maximum fine was $10,000. Section 5(b)(3) was repealed as part of the 1977 amendments to the TWEA, discussed in the text *infra,* prior to the time of indictment and trial, and the applicable statute is § 16.

3. 31 C.F.R. § 515.560 states in pertinent part:

(a) The following transactions are authorized:

(1) All transactions ordinarily incident to travel to and from Cuba.

(2) All transactions ordinarily incident to travel in Cuba, including payment of living expenses and the acquisition in Cuba of goods for personal consumption there.

(3) The purchase in Cuba, and importation as accompanied baggage, of merchandise with a foreign market value not to exceed $100 per person, for personal use only. Such merchandise may not be resold. The authorization in this subparagraph may only be used once in every six consecutive months.

(4) All transactions by any person incident to arranging or assisting travel by any other person or group of persons to, from, or in Cuba. This authorization includes arranging through transportation to Cuba; selling passage aboard a foreign carrier providing regularly scheduled service to Cuba from points

outside the United States; chartering an aircraft or vessel; arranging hotel accommodations in Cuba; ground transportation, local tours and similar travel activities in Cuba; transfer of funds to Cuba or any national thereof; and receipt from Cuba or a national thereof of consideration for authorized services.

(5) All transactions on behalf of aircraft or vessels incidental to nonscheduled flights or voyages to, from, and in Cuba. This paragraph does not authorize the carriage of any merchandise to and from Cuba except accompanied baggage and merchandise authorized by paragraph (a)(3) of this section.

(6) All transactions incident to the processing and payment of checks, drafts, traveler's checks, and similar instruments negotiated in Cuba by any person under the authority of this section.

(7) Processing and payment by United States credit card instruments (vouchers, drafts, or sales receipts) for authorized expenditures in Cuba forwarded by credit card companies in third countries to the domestic issuer for payment or reimbursement. Foreign credit card firms owned or controlled by U.S. persons are authorized to contract with a Cuban enterprise for the extension of credit through the use of credit cards. However, this paragraph does not authorize a domestic credit card issuer to contract with a Cuban enterprise for the extension of credit to any traveler for any purpose.

nor lawyers classify as *malum in se*—and which, in fact, ordinary people consider to be their legal responsibility to perform.

In such circumstances, criminal willfulness requires more than the ordinary legal assumption that the person charged know what he is doing and act deliberately. A finding of specific intent is essential. *United States v. Davis*, 583 F.2d at 193; *United States v. Schnaiderman*, 568 F.2d 1208, 1211 (5th Cir.1978); *United States v. Granda*, 565 F.2d 922, 926 (5th Cir.1978). Because the activities denoted unlawful "are spelled out in administrative regulations and include items not known generally to be controlled by the government," *United States v. Davis*, 583 F.2d at 193, the regulatory provisions must be "*actually known*" and "*intentionally violated*" for a crime to be committed. *United States v. Warren*, 612 F.2d 887, 890 (5th Cir.) (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980) (emphasis in original). *Accord United States v. Schnaiderman*, 568 F.2d at 1211. Regulation 515.-415 made the listed activities unlawful *unless* a special license was obtained from the Office of Foreign Assets Control of the Department of the Treasury. Where licensing and/or reporting requirements are involved, specific intent cannot be shown unless the defendants are apprised of both the necessity for obtaining, and the possibility of obtaining such license. "The failure of the government to make known the requirements of the statute is fatal to [its] case.... Proof of the requisite knowledge and willfulness ... is almost impossible unless affirmative steps are taken by the government to make the laws' requirements known." *United States v. Granda*, 565 F.2d at 926. *See United States v. Warren; United States v. Schnaiderman; United States v. Granda* (violation of reporting provisions of Bank Secrecy Act); and *United States v. Hernandez; United States v. Davis* (failure to obtain a license for munitions exports). As the former fifth circuit stated in *United States v. Granda*, 565 F.2d at 926, "Since the purpose of all law, and the criminal law in particular, is to conform conduct to the norms expressed in that law, no useful end is served by prosecuting the 'violators' when they have no knowledge of the law's provisions." The requirement of notice is grounded in the Constitution. *Lambert v. California*, 355 U.S. 225, 228–230, 78 S.Ct. 240, 242–44, 2 L.Ed.2d 228 (1957) ("Engrained in our concept of due process is the requirement of notice.... Where a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with due process").

Although the government conceded at trial that specific intent would have to be proven,[4] it argues on appeal that appellants' knowledge that they might be liable for repeat trips or boat safety violations; or that they might be subject to forfeiture of their vessel under civil statutes; or that the government generally disapproved of the boatlift as dangerous and inadvisable constitutes the requisite specific intent. "Crimes are not to be created by inference" from the combination of civil statutes and government disapproval. *United States v. Laub*, 385 U.S. 475, 487, 87 S.Ct. 574, 581, 17 L.Ed.2d 526 (1967) (holding that regulations requiring that passports be specially validated for travel to Cuba, whose purpose was to place travelers on notice that State Department protection could not be provided there, could not serve as the basis for criminally prosecuting persons who traveled to Cuba without such specially validated passports). The finding that a defendant is aware that his conduct is generally unlawful is insufficient to sustain a finding of guilt under a statute requiring specific intent. *United States v. Hernandez*, 662 F.2d at 292 ("While it is true that Hernandez' concealment of the weapons possibly sup-

---

**4.** The prosecutor, in argument to the court before the trial had begun, plainly indicated that the government would have to prove some knowledge by defendants of the promulgation of section 515.415:

As to Mr. Meadows' [counsel for Perez] argument that a new regulation was passed without publicity: Well, sir, that is a defense to this action. This is a specific intent crime.

ported a jury finding that he knew his conduct was unlawful ... such a finding falls short of deciding that he knew he was unlawfully exporting weapons on the Munitions List"); *United States v. Granda*, 565 F.2d at 926 (evidence tending to show that the defendant thought it might be illegal to enter the country with more than $5,000 does not support the finding that the defendant knew it was necessary to disclose that she was entering with more than $5,000).

The government does not maintain that the evidence presented at trial is sufficient to sustain a finding of guilt for a specific intent crime. At oral argument, counsel for the government conceded that the "priests didn't know chapter and verse of the law they intended to violate." Still, the government argues that the evidence demonstrated the necessary "scienter." The government relies principally on the testimony of government officials who stated that they had warned the priests that the venture was against the law.[5]

█ The warnings given by the government officials are inadequate to support a finding of specific intent. They did not describe, refer to, or even hint at the proscriptions of Regulation 515.415. Mr. Myles Frechette, Director of the Office of Cuban Affairs, testified that "what was illegal was going to Cuba to make private arrangements to bring people out," because "bringing back people to the United States can only be accomplished under the Immigration and Nationality Act or related Acts." He did not mention the Regulation or the TWEA nor could he have done so. The meeting between the priests and Mr. Frechette took place on March 18, 1980—one month before the Mariel boatlift began and two months before Regulation 515.415 was promulgated.

Mr. Stephen Page, then a staff assistant of the Intergovernmental Affairs Staff, tes-

tified that, in a telephone conversation with Father Frade on approximately May 14, 15 or 16, 1980, he stated that he could not grant the priests permission to go to Cuba to pick up refugees "because it was a violation of the law." He explained, "I didn't make any specific reference to the law. I am not a lawyer. I told them it was against the law because that is what the President said." In a letter which he subsequently drafted for the signature of another official, he indicated that his advice was based upon "the President's May 14 Executive Order." Mr. Thomas Casey, then a federal coordinating officer in Miami responsible for the refugee situation, testified that his advice that it was illegal to go down to Cuba to pick up refugees was based upon an elaboration of the President's May 14th statement made by Mr. Eugene Eidenberg. Mr. Eidenberg himself, then deputy assistant to the President's cabinet and deputy assistant on intergovernmental relations to the President, testified that he never advised anyone that they could be prosecuted under the TWEA, and that he understood that those who would be prosecuted would be prosecuted under existing immigration law and customs regulations. He testified that he was not specifically aware of any regulations promulgated under the TWEA, despite the fact that he was involved with Mariel boatlift policy on a "very high level" and had participated in several intimate conferences with the President concerning the formulation of the Mariel boatlift policy. Thus, no government official ever indicated to the appellants that financial transactions incident to Cuban travel were unlawful, mentioned Regulation 515.415 by name or otherwise, or, more importantly, suggested to them that valid permission might be obtained by application to a different government agen-

---

5. The government also argues that the priests' own behavior, including their fears and expressed concerns as testified to by members of the crew of *God's Mercy*, and their decision to captain the vessel on the return voyage, supports a finding of specific intent. In light of the ambiguous advice provided to the appellants in their search for information, and the daily changing nature of presidential policy on the Mariel boatlift, their concerns are understandable as normal caution and worry for the welfare of all concerned.

cy, the Office of Foreign Assets Control of the Department of the Treasury.[6]

In a footnote to its brief, the government, citing *United States v. Restrepo-Granda,* 575 F.2d 524, 527 (5th Cir.1978), *cert. denied,* 439 U.S. 935, 99 S.Ct. 331, 58 L.Ed.2d 332 (1979), and *United States v. Jewell,* 532 F.2d 697 (9th Cir.), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976), argues that once the appellants realized that conduct similar to what they contemplated might be illegal it was incumbent upon them to make further inquiry. Appellants, on the other hand, maintain that the research and inquiries they undertook induced them to rely on the White House Statement on the Administration Policy Toward the Refugees of May 14, 1980. They understood this to state that they would be criminally prosecuted only for tampering with a seized ship, gross violations of boat safety law, or making repeated trips to Cuba. They claim that now they "may not be punished for actions undertaken in good faith reliance upon authoritative assurance that punishment will not attach." *United States v. Laub,* 385 U.S. at 487, 87 S.Ct. at 581.

It was impossible for the priests to obtain the actual text of Regulation 515.415. The Regulation had not been published by its effective date. An announcement of its promulgation, although not its contents, was broadcast by the Coast Guard in the Florida Straits in the days following its promulgation.[7] As the Coast Guard was aware, these broadcasts were being jammed and garbled by Cuba, and might not have been received by anyone. Further, the priests were not aboard the *God's Mercy* during its outward voyage, and during the

two weeks of negotiations in Cuba they were largely prevented from communicating with their crew who were housed in a cordoned off area at Mariel. The first possible direct knowledge of the Regulation which the priests could have received was during the return voyage, after the acts for which they were convicted had been committed.

The evidence disclosed that the priests made extensive efforts, up to the time of their voyage, to discover and keep abreast of government policy towards the refugees. On March 18, 1980, a month before the boatlift began, Frade and Doss met with Mr. Frechette to discuss the possibilities of bringing in Cuban refugees under the Refugee Act of 1980 (the Act which President Carter subsequently used to authorize the entry of the refugees), but Mr. Frechette was unaware of the Act's provisions. On May 7 and 8, 1980, before turning over the list of the names to the Cuban Interest Section, Frade and Doss went to the offices of Senator Russell Long, Senator Bennett Johnston, Congressman Gillis Long, Congressman John Breaux, and Congresswoman Lindy Boggs, asking for advice on how they might carry through with their planned trip. A letter by Congresswoman Boggs seeking clarification on their behalf was not answered until July 3rd, after the priests were indicted. Congressman Long testified that the priests "wanted general information about making sure what the United States policy was, to do it in accordance with the policy of the United States." He stated that, at that time he "was of the impression from the President's [May 5] statement . . . that the United States was

---

**6.** For example during cross-examination of Mr. Page the following exchange took place:

Q: Now you say you told Father Frade that you couldn't authorize him to go to Cuba?

A: Yes, sir.

Q: Did you mean by that you were just the wrong bureaucrat to call?

A: No, sir. I referenced the May 14th Executive Order.

**7.** On May 16, 1980, the Coast Guard added the following language to its marine broadcasts concerning the boatlift:

U.S. Treasury Department has amended its Cuban assets control regulations. A copy of the amended regulations will be furnished. The U.S. Treasury Department has amended its Cuban assets control regulations involving transportation to the United States. Any violations of the new violations [sic] constitutes [sic] a violation of U.S. law punishable by a maximum fine of $50,000 and/or imprisonment not to exceed 10 years.

encouraging and welcoming" the boatlift. Following submission of the names they again met with Congressman Long, and spoke with representatives of the State Department, the Justice Department, the Immigration and Naturalization Service, and the White House (including Press Secretary Jody Powell and Jay Higgs, liaison between the White House and the Democratic Convention). The priests also consulted with an attorney and read the *New York Times* daily searching for White House press statements. After the May 14 statement, Frade and Doss went back to the senators and congressmen with whom they had spoken, again seeking advice and asking the legislators "if they would inform the President" of what they were doing.

None of this inquiry revealed either the existence or the contemplation of new regulations under the TWEA or pointed the priests towards the Office of Foreign Assets Control. Those who testified that they had notified the priests of the illegality of the voyage stated that they did so in general terms, and upon cross-examination revealed that it was their understanding that the trip would be illegal under *existing* immigration and customs laws and regulations, and that the basis for this understanding was the May 14th presidential statement.

The issue then of whether the priests were put on notice of further inquiry, as the government contends, or were justified in their reliance on the legality of their acts, as appellants maintain, centers on the reasonable interpretation of the May 14th presidential statement in the context of the Mariel events. On May 2, 1980 the President announced the expansion of Coast Guard facilities to assist in rescue operations, the expansion of refugee reception facilities at Key West, and the establishment of a new facility in Fort Walton Beach, Florida. On the same day he signed a Presidential Determination authorizing the use of $10 million for the start up of the Fort Walton Center. The only comment regarding possible illegalities was the warning that the United States would enforce the immigration laws by refusing entry to those with criminal records whom the Cuban government had forced onto the boats. Cuban Refugees: Announcement of Federal Actions in Response to the Emergency, May 2, 1980. On May 5, 1980 at a press conference in Miami, the President responded to a question from a representative of the League of Women Voters:

> [L]iterally tens of thousands of others will be received in our country with understanding, as expeditiously as we can, as safely as possible on their journey across the 90 miles of ocean, and processed in accordance with the law.... But we'll continue to provide an open heart and open arms to refugees seeking freedom from Communist domination and from economic deprivation, brought about primarily by Fidel Castro and his government.

The President's "open heart and open arms" statement was broadly interpreted as governmental approval of the boatlift.

Then on May 14, 1980, still maintaining that "the United States will welcome Cubans, seeking freedom, in accordance with our laws, and we will pursue every avenue to establish an orderly and regular flow," the President made the statement at issue here. White House Statement on Administration Policy Toward the Refugees of May 14, 1980. In his Remarks to Reporters Announcing Administration Policy Toward the Refugees, the President introduced a "five-point program to permit safe and orderly passage," described as "additional steps to end Cuba's inhumane actions and to bring safety and order to a process that continues to threaten lives." The five points included readiness to start an airlift and sealift, opening of a family registration center in Miami, enforcement of "custom immigration laws," deportation of the Cuban criminals, and consultation with the international community. The President then issued the White House Statement on the Administration Policy Toward the Refugees of May 14, 1980. Because of its importance to this case, we quote the relevant portions below:

The Coast Guard is now communicating with these vessels illegally enroute to or from Cuba and those already in Mariel Harbor to tell them to return to the United States without taking Cubans on board. If they follow this directive, they have nothing to fear from the law. We will do everything possible to stop these illegal trips to Cuba. We will take the following steps to ensure that the law is obeyed:

(a) The Immigration and Naturalization Service (INS) will continue to issue notices of intent to fine those unlawfully bringing Cubans to this country. As fines become due, they will be collected.

(b) All vessels currently and unlawfully carrying Cubans to this country will henceforth be seized by the Customs Service.

(c) Anyone who tampers with or seeks to move a ship to Cuba which has been seized will be subject to separate criminal prosecution.

(d) The Coast Guard will continue to review each vessel that returns to the United States for violations of boat safety law. Those found to be in gross violation of the law will be subject to criminal prosecution and additional fines. Furthermore, boats which are found to be safety hazards will be detained.

(e) Any individual who has been notified by INS for unlawfully bringing Cubans into the country and who makes another trip will be subject to criminal prosecution, and the boat used for such a repeat trip will be seized for forfeiture proceedings.

(f) Law enforcement agencies will take additional steps, as necessary, to implement this policy and to discourage the unlawful boat traffic to Cuba.

Because this announcement was a simple policy statement, not an Executive Order as the government witnesses maintained at trial, we refrain from parsing it with the precision which we would employ in statutory analysis. But the import of the specif-ic provisions in subparagraphs (a) through (f), seen against the background of Mariel, as we understand it, is that the Administration would continue to welcome legitimate Cuban refugees, but would take firm coordinated action to prevent the two dangers which had emerged from the boatlift: death and injury at sea resulting from passage in unsafe vessels, and entry into the United States of Cuban undesirables forced onto the boats by the Castro regime.

It was in this way that the priests understood the presidential statement, and these requirements with which they made every conceivable effort to comply. Their vessel was safe and seaworthy; their crew included an experienced pilot, a physician and a nurse. Their extensive negotiational efforts with the Cubans were rewarded in their taking on as passengers only the named individuals on their lists and ex-political prisoners. They turned over the passengers to the immigration authorities upon their return to the harbor at Key West and committed no violation of the immigration laws.[8]

It is, then, only (f) stating that "Law enforcement agencies will take additional steps, as necessary, to implement this policy and to discourage the unlawful boat traffic to Cuba," which might have put the priests on notice that they were committing a criminal offense. We need not analyze this sentence with the rigors reserved for statutory analysis to recognize that "law enforcement" is generally understood as a different thing from "law making." Further, even those witnesses who testified that they believed the boatlifts to be in violation of the law stated that they understood them to be unlawful under existing law, not under new or proposed law, and that the laws which they had in mind were those which referred by their terms to the activities taking place—sea voyages and immigration. Nothing in the statement could have reasonably put anyone on notice that criminal prosecutions would take place under a statute never referred to by government offi-

---

**8.** Dismissal of the indictments against the priests under the immigration laws was af-firmed by this court. *United States v. Zayas-Morales,* 685 F.2d 1272 (11th Cir.1982).

cials for activities which were legal and ongoing throughout the days of the boatlift.

■ We cannot go so far as appellants would have us, by holding that the May 14th statement constituted the "active misleading" necessary for a finding of reliance. *United States v. Laub,* 385 U.S. at 487, 87 S.Ct. at 581, *quoting Raley v. Ohio,* 360 U.S. 423, 438, 79 S.Ct. 1257, 1266, 3 L.Ed.2d 1344 (1959). The statement gave sufficient warning that administrative response to the boatlift was changing daily. Evidence of active reliance is belied also by the appellants' own actions in earnestly seeking to keep up-to-the-minute on policy changes, in attempting to obtain special White House permission for their voyage, in deciding to formally captain the boat on the return voyage so that any possible onus might fall personally on them, and in their own trial testimony that they would have gone ahead with the mission regardless of the law because of their moral commitment to those whose names were on the lists submitted to the Cuban government.

But while the text of the presidential statement is insufficient to serve as a basis of reliance, it is also insufficient to have placed the priests on notice of the need for further inquiry. The principle that the courts must decline to impose punishments for actions that are not "plainly and unmistakably" proscribed is fundamental to our law. *United States v. Gradwell,* 243 U.S. 476, 485, 37 S.Ct. 407, 410–11, 61 L.Ed. 857 (1917), *quoting United States v. Lacher,* 134 U.S. 624, 628, 10 S.Ct. 625, 626, 33 L.Ed. 1080 (1890). As the Supreme Court but recently stated "a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* —— U.S. ——, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). This requirement is even more rigorous where the amorphous due process concept of notice is coupled with the specific knowledge of the criminal provisions required for a finding of guilt in a specific intent crime.

The judgment of the district court must be reversed.

## THE INVALIDITY OF REGULATION 515.415

The stated statutory authority for 31 C.F.R. § 515.415 (1981) is section 5(b) of the TWEA. Although a 1977 amendment to the TWEA generally repealed the Executive's peacetime authority under the TWEA, Pub.L. 95–223 §§ 101(a) and (d), 91 Stat. 1625 (1977), the government contends that the regulation is valid under the "grandfather clause" of the 1977 amendment. The "grandfather clause" states:

[T]he authorities conferred upon the President by section 5(b) of the Trading With the Enemy Act which were being exercised with respect to a country on July 1, 1977, as a result of a national emergency declared by the President before such date, may continue to be exercised with respect to such country [if the President determines it to be in the national interest].

*Id.* at § 101(b).

Arguing for an expansive reading of this provision, the government strenuously contends that 31 C.F.R. § 515.415, prohibiting transactions incident to travel to, from, and within Cuba when in connection with the transportation of certain Cuban nationals from Cuba to the United States, falls within the category of authorities being exercised on July 1, 1977, because, on that date, Executive authority under the TWEA was being exercised regarding Cuba through the Cuban Assets Control Regulations. The government argues that either Regulation 515.415 is a mere explanatory modification of the Cuban Assets Control Regulations, or, alternatively, the existence of some regulations regarding Cuba under the TWEA as of July 1, 1977, is a sufficient ground to invoke the grandfather clause as statutory authority for the promulgation of future regulations regarding Cuba.

While the ambiguous terms "authorities" and "exercised" may appear to be elastic enough to encompass the interpretation for which the government argues, we agree with the recent first circuit opinion in *Wald*

*v. Regan,* 708 F.2d 794 [No. 82–1695, May 16, 1983] (1st Cir.1983), that a narrow, restrictive interpretation is compelled by the legislative history and purpose of the grandfather clause and by its function within the broader statutory scheme.

First, the legislative history reveals that it was the intent of Congress to grandfather only the ongoing uses of Executive authority. "[T]hroughout the committee hearings and the House and Senate reports, nearly every time a legislator referred to the 'savings clause' and to the exercise of the TWEA 'authorities,' he spoke of specific, existing *'uses'* of those authorities." *Wald v. Regan,* 708 F.2d at 798 [manuscript at 11] (emphasis in original). *See* Report of the Committee on International Relations on H.R. 7788: Trading With the Enemy Act Reform Legislation, H.R.Rep. No. 459, 95th Cong., 1st Sess. 2 (1977) (TWEA Reform) ("the current uses of these authorities ... may continue"); *id.* at 10 ("'grandfathering' existing uses of these powers"); Emergency Controls on International Economic Transactions: Hearings before the Subcommittee on International Economic Policy & Trade of the House Committee on International Relations, 95th Cong., 1st Sess. 147 (1977) (Emergency Controls) (statement of R. Roger Majak, Staff Director of Subcommittee on International Economic Policy & Trade) ("There is a clear need to grandfather or deal in some special way with existing uses of section 5(b) authorities"); *id.* at 168 (statement of Rep. Cavanaugh) ("where the powers of 5(b) are currently operative"); *id.* at 189 (statement of Rep. Bingham) ("it was the purpose ... to grandfather in existing uses of 5(b)").

Language which would have given broader scope to the grandfather clause by permitting "any other authority conferred upon the President by ... section [5(b) to be] exercised to deal with the same set of circumstances," Amendments to the Trading With the Enemy Act: Subcommittee Working Draft of June 8, 1977, 95th Cong., 1st Sess. § 101(b), was deliberately striken from the bill. Representative Bingham, a principal sponsor of the 1977 amendment, explained "I think it boils down to a ques-

tion of whether we are grandfathering a particular situation, and all the powers that may be necessary to deal with the situation, or whether we are grandfathering the particular authorities themselves and their usage ... I don't know why it should be necessary to give [the President] authority to expand what has already been done." Emergency Controls, *supra* at 167.

Second, the statutory context of the grandfather clause supports a restrictive interpretation. The intent of the 1977 emergency powers legislation was separation of peacetime Executive emergency powers from those available in time of declared war and subjugation of the former to closer congressional oversight. Section 5(b) of the TWEA was amended to "revert to what it originally was: a set of authorities for use by the President in time of war declared by Congress, in conformity with the Trading With the Enemy Act as a whole." TWEA Reform, *supra* at 10. Peacetime emergency powers were incorporated into a new statute, the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* (Supp. 1983) (IEEPA). The IEEPA delegates slightly more limited authorities to the President to act in times of national emergencies other than declared war, and subjects the exercise of these authorities to congressional consultation, review, and termination, 50 U.S.C. §§ 1703(a), (b), and (c) and 1706(b), and to the additional requirements of the National Emergencies Act, 50 U.S.C. § 1703(d) (Supp.1983).

Streamlining of the emergency powers field created a significant legislative problem: four important international financial regulatory systems, including the Cuban Assets Control Regulations, would have become automatically invalid under the new laws. The Cuban Assets Control Regulations had been promulgated under the old TWEA section 5(b), which did not contain a requirement that the national emergency invoked bear a relationship to the regulation promulgated. The Cuban Assets Control Regulations had been sustained by virtue of President Truman's 1950 declaration of national emergency because of the men-

ace of communist forces in Korea. *See Sardino v. Federal Reserve Bank,* 361 F.2d 106, 109–10 (2d Cir.), *cert. denied,* 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966). Under the new statutory scheme, such a rationale is insufficient. Section 1701(b) of the IEEPA requires that:

> The authorities granted to the President [through the IEEPA] may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be used for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

A concrete relationship between communist activities in Korea in 1950 and Cuban trade embargoes in 1977 was nonexistent. Further, the 1950 emergency itself had been terminated by section 1601(a) of the National Emergencies Act. An earlier interim grandfather clause, section 1651(b) of the National Emergencies Act, had permitted temporary continuation of section 5(b) peacetime regulations despite repeal of their justifying emergencies. *See* TWEA Reform, *supra* at 6; Report of the Committee on Government Operations: National Emergencies Act, S.Rep. No. 1168, 94th Cong., 2d Sess. 2, *reprinted in* 1976 U.S. Code Cong. & Ad.News 2288. The National Emergencies Act savings clause, however, died with the 1977 legislation.

This left Congress with four possible choices. First, the Cuban Assets Control Regulations could have been made subject to the 1977 legislation which "would be, in effect, automatically to terminate them." TWEA Reform, *supra* at 11. This was considered to be "inappropriate to legislation attempting to legislate for the future not to judge the past," *id.,* and inadvisable because the regulations were "deemed important for the continued day-to-day functioning of the Government." *Id.* at 6. Second, the regulations could have been considered individually on their merits and incorporated selectively into the new legislation. Because "[c]ertain current uses of the authori-

ties" were considered "controversial ... the committee decided that to revise current uses, and to improve policies and procedures that would govern future uses, in a single bill would be difficult and divisive." *Id.* at 9–10. Third, by allowing the regulations to terminate upon the effective date of the new legislation, Congress could have placed the President in the position of having to declare a new economic emergency regarding Cuba in order to continue the Cuban Assets Control Regulations. Declaration of a new Cuban emergency would have been subject to the publication requirements of the National Emergencies Act, 50 U.S.C. § 1621(a) (1983). Critical diplomatic problems might have been raised:

> To have required the President to announce publicly a *new declaration* of emergency in order to continue an *existing embargo* would have required him to undertake a political act with international political impact. The result, as described by Prof. Lowenfeld before the subcommittee, might have been an "inappropriate interference in negotiations being carried out by the Executive Branch...." .... Assistant Treasury Secretary Bergsten repeated this theme, stating that "a unilateral termination of the embargoes" that would require the President to reassert a national emergency "would severely undermine the U.S. negotiating position with those countries, and our worldwide posture."

*Wald v. Regan,* 708 F.2d at 799 [manuscript at 15–16] (citations omitted) (emphasis in original).

Therefore, Congress opted for the fourth choice: a limited grandfather clause which would insulate the ongoing regulatory programs from the new legislation. The grandfather clause was intended solely and entirely to protect those regulations existing at the time of the coming into effect of the IEEPA from the legal disruption which would have been caused by termination of their statutory authorization and the diplomatic disruption which might have resulted from declaring a new state of emergency. Unlike Regulation 515.415, the

existing regulations were not intended to curb travel or control the flow of immigration. The existing programs were entirely financial, and the grandfather clause was intended to be limited to such financial transactions. As Representative Bingham explained, the grandfather clause "specifically provides for the continuation of *trade embargoes* and *asset control programs* currently applied by the United States under the authority of section 5(b)." 123 Cong. Rec. 22475 (1977) (emphasis added). *See Wald v. Regan,* 708 F.2d 799 [manuscript at 15].

To reason, as the government would have us do, that the grandfather clause continues Executive authority to indefinitely promulgate regulations regarding Cuba, with any incidental financial implications whatever, under the authority of the old section 5(b) of the TWEA would render meaningless the revision of emergency powers authorities accomplished by the 1977 legislation and the National Emergencies Act. A primary purpose of the entire statutory overhaul was limitation, rationalization, and restructuring of section 5(b). In 1975, when the statutory reform was initiated, section 5(b) was considered "a prime example of the unchecked proliferation of Presidential power for purposes totally unforeseen by the creators of that power." TWEA Reform, *supra* at 9 (remarks of Peter Weiss, Vice President, Center for Constitutional Rights). As the House Committee on International Relations explained the need for TWEA reform:

> [T]hrough usage and amendment, section 5(b) has become essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review. These powers may be exercised so long as there is an unterminated declaration of national emergency on the books, whether or not the situation with respect to which the emergency was declared bears any relationship to the situation

with respect to which the President is using the authorities.

*Id.* at 7.

In 1975 we lived under the legal fiction that four states of emergency existed perpetually: President Roosevelt's 1933 banking emergency, President Truman's 1950 Korean War emergency, and President Nixon's 1970 post office emergency and 1971 balance of payments crisis. Report of the Committee on Banking, Housing and Urban Affairs: International Emergency Economic Powers Legislation, S.Rep. No. 466, 95th Cong., 1st Sess. 2, *reprinted in* 1977 U.S. Code Cong. & Ad.News 4540 (Banking Committee Report). "Any" of these emergency declarations could "be used by the President in conjunction with section 5(b) of the Trading with the Enemy Act to regulate domestic or international economic transactions or control property for an indefinite time." *Id., reprinted in* 1977 U.S.Code Cong. & Ad.News 4541. Section 5(b) was repeatedly invoked to justify novel and necessary presidential emergency action, ultimately becoming the legal link to resolve "the paradox posed by the need for emergency power in a constitutional regime." Note, The International Emergency Economic Powers Act: A Congressional Attempt to Control Presidential Emergency Power, 96 Harv.L. Rev. 1102, 1112 (1983). Consequently, "the whole field of emergency statutes and procedures was in disarray," Banking Committee Report, *supra* at 9, because 470 emergency statutes could be instantaneously utilized by the President under the authority of four legally extant emergencies bearing no relationship to international economic realities. *See* Note, The National Emergency Dilemma: Balancing the Executive's Crisis Powers with the Need for Accountability, 52 So.Cal.L.Rev. 1453, 1459 (1979). The National Emergencies Act was adopted to remedy this situation. "[T]he statute is an effort by Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes." Report of the Committee on Government Operations: National Emergencies Act, S.Rep.

No. 1168, 94th Cong., 2d Sess. 3 (1976). Its purpose was:

to terminate, as of 2 years from the date of enactment, powers and authorities possessed by the Executive as a result of existing states of national emergency, and to establish authority for the declaration of future emergencies in a manner which will clearly define the powers of the President and provide for regular congressional review.

*Id.* at 2, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2288. Because of the complexity of the regulatory structure which had developed under section 5(b) of the TWEA, revision of this section was postponed "to allow for a careful study of how to revise [it] in accordance with the intent of the National Emergencies Act without disrupting policies currently in effect under [its] authority." TWEA Reform, *supra* at 6. The ultimate revision of section 5(b) to conform it to the mandate of the National Emergencies Act was accomplished by the 1977 legislation. Thus, the scope of the revised TWEA grandfather clause was deliberately delimited to conform to "the intent of the National Emergencies Act." *Id.* at 11.

■ To hold that the grandfather clause permits the President to promulgate new peacetime regulations to deal with new international crises, which are immunized from the declaration of national emergency and congressional consultative provisions of the IEEPA and National Emergencies Act, would vitiate and render nugatory the entire carefully structured statutory scheme, a result which Congress clearly could not have intended. *See Jackson v. Kelly,* 557 F.2d 735, 740 (10th Cir.1977); *General Motors Acceptance Corp. v. Whisnant,* 387 F.2d 774, 778 (5th Cir.1968). Further, the very justification for the grandfather clause, preservation of the diplomatic status quo, is absent from this situation where the new regulations were issued in response to a new international crisis. *See Wald v. Regan,* 708 F.2d at 800 [manuscript at 16].

■ The government contends, in the alternative, that Regulation 515.415 is valid anyway because all of the restrictions it imposes are included in 31 C.F.R. § 515.201 of the Cuban Assets Control Regulations which was in force on July 1, 1977. Regulation 515.201 prohibits "all transfers outside the United States with regard to any property interest subject to the jurisdiction of the United States in which a Cuban or Cuban national has an interest." The government argues that the instant regulation is embraced within this provision because the term "transfer" may include the passage of ships from United States harbors to the harbors of Mariel, and Cuba has an identifiable "interest" in vessels entering or leaving its jurisdiction even if it does not enjoy a present property right in them. At oral argument, the government maintained that Regulation 515.415 merely "defined the scope of 515.201" and put persons on notice that the enumerated acts would be in violation of 515.201. While the language of Regulation 515.201 is admittedly broad, it is not broad enough to cover the present situation. We have held that the language of the Cuban Assets Control Regulations must be interpreted with a common sense regard for regulatory purposes and plain meanings. *Real v. Simon,* 510 F.2d 557 (5th Cir.1975). In *Real* we held that a decedent's interest in his estate was insufficient to invoke the provisions of the Cuban Assets Control Regulations, finding it inconsistent with the statutory purpose of blocking the transfer of funds for use in Cuba.

The concept that a dead person is a "foreign national" in possession of property within the meaning of the Trading With the Enemy Act does not have the support of logic. Under the facts presented by this case, such a determination does not have the support of the congressional policies behind the Act.

*Id.* at 564.

The linguistic extension here is even greater than in *Real,* and the connection with the purposes of the Cuban Assets Control Regulations is even less. Their exclusively economic purposes have been identified in previous cases as: (1) denying to Cuba or its nationals hard currency which

might be used to promote activities inimical to the interests of the United States; (2) retaining blocked funds for possible use or vesting to the United States should such a decision be made; and (3) use of blocked funds for negotiation purposes in discussions with the Cuban government. *Tagle v. Regan,* 643 F.2d 1058, 1062 n. 5 (5th Cir. 1981) (Unit B); *Real v. Simon,* 510 F.2d at 563. While the restrictions on travel imposed by Regulation 515.415 might have some trivial financial impact, it is insufficient to make Regulation 515.415 a financial regulation. That the regulation was directed exclusively at the Cuban refugee flow is evident from a comparison of Regulation 515.415 with Regulation 515.560. At the time relevant here, Regulation 515.560 expressly authorized the very transactions prohibited by Regulation 515.415 (travel to, from and within Cuba and expenses incident thereto) when not done in connection with the transportation of Cuban nationals.

 The government further argues that, had this regulation not been promulgated pursuant to section 5(b), the Executive would have been unable to combat the Cuban refugee crisis. This contention must be rejected. Regulation 515.415 could have been validly promulgated under the IEEPA, 50 U.S.C. § 1701, pursuant to a declaration of national emergency transmitted to Congress and published in the Federal Register as required by the National Emergencies Act, 50 U.S.C. §§ 1621(a), 1701 and 1702 (Supp.1982). As discussed voluminously above, it was the expressed and codified intent of Congress to require that presidential peacetime emergency powers be exercised in conformity with this statutory scheme. When the President acts pursuant to a congressional delegation of authority, his power in foreign affairs is plenary. *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). But when "the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive

Presidential control in such a case only by disabling the Congress from acting upon the subject." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637–38, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). We cannot disable Congress from acting here. If Regulation 515.415 is to be considered as falling validly within the scope of section 5(b) of the TWEA, as the government contends, then it must be as a regulation on international commerce. The power to regulate international commerce is vested in Congress by Art. 1, § 8 of the United States Constitution and is beyond our power to affect. Even if we view Regulation 515.415 as what it really is, an immigration control measure, the government's inherent powers argument must fall. Power over immigration matters belongs jointly to the legislative and executive branches, and when exercised by the President, should be in conformity with congressional intent. *United States ex rel. Knauff v. Shaugnessy,* 338 U.S. 537, 540, 70 S.Ct. 309, 311, 94 L.Ed. 317 (1950). This is especially true when the power is exercised in the imposition of a criminal sanction upon persons in the United States, a matter normally within the congressional domain. *See* L. Henkin, Foreign Affairs and the Constitution 95–96 (1972). The presidential power to exclude aliens, a concomitant of the foreign affairs power, *United States ex rel. Knauff v. Shaugnessy,* 338 U.S. at 542, 70 S.Ct. at 312, does not include the power to enact general immigration laws by executive order. "Even where the President's authority is clear and perhaps primary" it is limited by acts of Congress "for purposes of domestic law," Henkin, *supra* at 96. In holding, as we now do, that Regulation 515.415 is invalid as in excess of the emergency authority delegated to the President under the present section 5(b) of the TWEA, "we do not *limit* the exercise of foreign affairs powers" by the President, but "*allocate* the powers of decision-making between ... [Congress and the President] according to the guidelines Congress set forth." *Wald v. Regan,* 708 F.2d at 800 [manuscript at 18], thus preserving "the

equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. at 638, 72 S.Ct. at 871 (Jackson, J., concurring). The judgment of the district court is

REVERSED.