**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Guy Willard TOOKER, Bao Tran, Roy John Scott and Robert C. DeBrophy, Defendants–Appellants.**

No. 91–2148.

United States Court of Appeals, Fifth Circuit.

March 30, 1992.

On Petition for Rehearing and Suggestion for Rehearing En Banc May 8, 1992.

---

Robert J. Fickman (Court-appointed), Schaffer, Lambright, Odom & Sparks, Houston, Tex., for Scott.

David P. Cunningham, Houston, Tex. (Court-appointed), for DeBrophy.

Don Ervin, Houston, Tex., for Tooker.

Marjorie A. Meyers, Atty., Houston, Tex. (Court-appointed), for Tran.

Mervyn Hamburg, Atty., Appellate Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., Paula C. Offenhauser, Ronald G. Woods, U.S. Atty., Houston, Tex., for the U.S.

Before REAVLEY, HIGGINBOTHAM, and DeMOSS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Guy Tooker, John Scott, Bao Tran, and Robert DeBrophy appeal convictions for conspiracy to violate the Trading with the Enemy Act, contending that there was insufficient evidence. We affirm.

## I.

This case arises out of the Customs Service's investigation of an alleged conspiracy of appellants and others to purchase rice from Vietnamese nationals in violation

of the Trading With the Enemy Act, 18 U.S.C. § 371 and implementing federal regulations. Bao Tran, Khanh Cong Tang, Binh Vinh Tran, Tooker, DeBrophy, and Scott, were charged in a two-count indictment with conspiring to violate the TWEA and its substantive violation. All the defendants moved for and received a judgment of acquittal on the substantive count at the end of the government's case in chief.

During deliberation, at the jury's request the judge gave additional instruction on the relevance of ignorance of the law to the verdict. The jury reached a partial verdict as to Tang, DeBrophy, Scott, and Tooker. The jury then requested further instruction on the definition of "willful" action under TWEA. The court again instructed the jury that the defendant "must know what the law forbids" in order to have the intent necessary for conviction under TWEA. Following this instruction, the jury convicted Tran. The jury acquitted Binh Vinh Tran on all counts.

Tran was sentenced to 90 days followed by two years of supervised release. Tooker received one year in prison, two years of supervised release, and a $100,000.00 fine. Scott and DeBrophy each received three years probation.

## II.

Bao Tran and Khanh Cong Tang ran a trading company called Intercontinental Trading. The Customs Service began an undercover investigation of Intercontinental Trading in October, 1989. As part of this investigation, the Customs Service set up an office purporting to be a commodity trading company called "Charter Trading" and assigned an agent, Greg Gessner, to hold himself out as Charter Trading's "representative." Through an informant, Charter Trading began negotiations with Intercontinental Trading, purportedly for purchasing products from Vietnam.

The investigation produced 24 tape-recorded or videotaped interviews between the agent and defendants from a five-month period between December 11, 1989 and April 20, 1990. The first recorded conversation was on December 11, 1989, when Gessner first telephoned Intercontinental Trading, and the last on April 17, 1990. Gessner and Tang met on December 13, 1989, to discuss Gessner's proposed transaction in more detail. Tang proposed to sell rice to Gessner through a company run by DeBrophy called "MEAMCO." Gessner expressed interest in this transaction. On December 14, DeBrophy sent Gessner a memorandum describing Vietnamese rice and proposing to ship such rice to Gessner beginning in December, 1989. DeBrophy stated in the memorandum that "our man is in Saigon" to arrange the transaction. At a later telephone interview, when Gessner asked whether the country of the rice's origin would be reflected on the shipments, DeBrophy explained that the Vietnamese rice was mixed with Thai rice and was shipped to the United States as "Thai rice."

On January 4, 1990, Gessner met at Charter Trading's "office" with Tang and with Tooker, the owner of Bob's Pawn Shop. Tooker was described as the "financier" of the transaction. Tooker stated that he would not go to Vietnam because he believed that "it was against the law for an American to go to Vietnam." In response, Gessner stated:

"To be technically accurate here, I think that it's against federal law to ... be negotiating this kind of deal. That's why I want to be very careful about this."

Later in the meeting, Tooker stated that Gessner could pay for the goods with gold, and gold could be sent to and sold in Hong Kong, so that the "gold would not have to go to Vietnam."

Gessner telephoned Tooker on January 18. Tooker then complained that he had not yet turned a profit on the deal, despite his investment of $65,000.00.

Gessner met again with Tang and Tooker at Charter Trading on January 24. Gessner expressed for a second time the danger of being detected while dealing with the government of Vietnam. Tooker stated that they were "protected" because they were not actually selling anything but rather were simply middlemen arranging a sale. Moreover, he stated that they were not dealing with the government of Vietnam, because all the planes "have been

going to Hong Kong." Tang again re-assured Gessner that his visit to Vietnam would not show up on his passport. At the close of the meeting, Tooker warned the other participants not to discuss the trans-action around strangers.

Tang, Tooker, and Gessner met for a third time on January 25. At this meeting, Tooker asked Gessner if he was actually working for the C.I.A. When Gessner re-plied that he was not an undercover agent and was not trying to "set them up", Tang stated that, even if Gessner was working with the C.I.A., Tang was "glad to deal with [him]."

Gessner began negotiations with Tran on January 26 by telephoning him in Vietnam where he remained until March 13. Gess-ner faxed Tran a list of questions to which he responded in writing by stating that the transactions would involve high Vietnam-ese government officials and that Gessner need not get his passport stamped when visiting Vietnam.

During telephone conversations with Gessner in February, Tooker and DeBro-phy discussed arrangements to prevent Gessner from having contact with Vietnam. Tooker stated that Gessner would not be going to Vietnam, but rather to Thailand. Gessner replied that he understood Took-er's statement to mean that "I won't show anything else on my passport." DeBrophy also stated that "If the U.S. government don't [sic] like ... Royal Columbia doing any business with the Vietnamese, we can get Royal Columbia registered in Columbia to do business. No problem." Royal Co-lumbia was the name of a business with which DeBrophy and Scott were affiliated.

Soon after these conversations, Gessner received a letter of intent from DeBrophy that referred to the purchase of "Basmati rice." The letter was signed by DeBrophy and Scott, DeBrophy's partner. On Febru-ary 23, Gessner met with Scott, DeBrophy, and Tooker at DeBrophy's office to discuss the proposed contract. This is the only meeting at which Scott and Gessner were both present. During this meeting, Gess-ner mentioned the TWEA by name for the first time, stating that "technically we are

in violation of [TWEA]" simply by negotiat-ing the transaction.

In response, the three defendants present stated that they believed that U.S. relations with Vietnam would soon be nor-malized such that it would soon be legal to transact business with Vietnam nationals. All three expressed some reluctance to go forward with the transaction until relations with Vietnam were "normalized." Scott expressed his desire to wait until business with Vietnam was "legitimate." DeBrophy stated that he would not sell rice until normalization, because he did not wish to get involved in "sub rosa stuff." Tooker stated that "he would not want to do any-thing if I thought I'd get in trouble."

However, in contrast with these state-ments, the defendants also expressed a de-sire to conceal their transaction and go forward with it, despite their knowledge of its illegality. Tooker recommended that the rice be described as "Southeast Asia rice," because "it is against the law in this country to do business with Vietnam, so we don't need to say Vietnamese rice." De-Brophy stated that until relations are nor-malized, "we still have to pretend." Scott reassuringly advised that "unless someone disturbs the State Department, no one is likely to get into trouble." Tooker reit-erated this sentiment when he told Gessner that "my name and your name would never appear together" on the documents evi-dencing the transaction.

On March 13, Tran returned to the Unit-ed States from Vietnam, via Thailand. He carried a twenty-pound sack of rice on his person that he did not declare to customs. Tran admitted that the rice came from Vi-etnam when Customs officials discovered it in his suitcase.

On April 13, Gessner telephoned Tooker at his pawn shop. Tooker told Gessner that he did not wish to do anything illegal and that he did not "know that much about the law." On April 17, Tooker repeated his wish not to do "anything wrong." He also stated that he would retain an attorney familiar with international law to explain the TWEA, and he expressed his belief that the transaction "may be legal in May" af-ter the allegedly pending normalization of relations with Vietnam. Tooker ended by

stating that they should "set up the transaction subject to the dropping of the sanctions." Gessner later called Tang at the offices of a company called "Mountain Aroma." When Gessner asked Tang whether he wanted to delay the transaction until normalization, Tang stated, "I don't think so...."

On April 20, the defendants were arrested, and the Customs Service searched the premises of Royal Columbia, Mountain Aroma, and Tooker's Pawn Shop. These searches turned up letters or faxes discussing the price of Vietnamese rice and various sales of such rice to firms and countries. Three of the letters discussed the sale of Vietnamese rice to Libya. The search also turned up a letter from Tran to Tang advising that they purchase Vietnamese rice from the Vietnamese government and a contract between Scott, Debrophy, and a Canadian firm for the purchase of Vietnamese rice and sale of the rice to Libya. The search revealed a contract between Intercontinental Trading (entered into by Tran on October 25, 1989) and a Vietnamese company, Tedico Vina Dong Thap, for the shipment of 850,000 metric tons of Vietnamese rice commencing on December 1989.

At trial, only Tooker and Tran's wife testified. Tooker stated that he intended to do business with Vietnam only after sanctions were lifted. He claimed to be unaware of the need to obtain a license in order to do business with Vietnam. Tran's wife stated that her husband went to Vietnam to assist his parents in coming to the U.S.

### III.

■ We must affirm if a reasonable trier of fact could conclude from the evidence produced at trial that the elements of the offense were established beyond a reasonable doubt, viewing all evidence in the light most favorable to the jury's verdict and drawing all reasonable inferences from the evidence to support that verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942); *United States v. Prieto–Tejas*, 779 F.2d 1098, 1101 (5th Cir.1986). Moreover, the evidence need not exclude every reasonable hypothesis of innocence for this court to affirm the jury's verdict. *United States v. Juarez–Fierro*, 935 F.2d 672, 677 (5th Cir. 1991); *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir.1989).

■ The regulations of the Office of Foreign Assets Control, promulgated pursuant to TWEA, 50 U.S.C. App. § 5(b)(1)(B),[1] prohibit, except as specifically authorized by the Secretary of the Treasury, "[a]ll dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States" if such transactions "involve property in which any designated foreign country, or any national thereof, has ... had any interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 500.201(b)(1). A license from the Office of Foreign Assets Control is required to engage in the prohibited transactions with a designated country. Vietnam is a designated country.

■ TWEA also provides severe criminal penalties for "[w]hoever shall *willfully* violate [regulations promulgated pursuant to TWEA]." 50 U.S.C.App. § 16 (West 1990) (emphasis added). Willful violation of TWEA is an essential element of any conviction under the Act. *United States v. Frade*, 709 F.2d 1387, 1391 (11th Cir.1983). The government must prove "at least the degree of criminal intent necessary for the substantive offense." *United States v. Davis*, 583 F.2d 190, 192 (5th Cir.1978).

We have not addressed the mental state required for a conviction under the TWEA. We have interpreted similar statutes and read them to require proof that a defendant had specific intent. *See, e.g., United*

---

1. 50 U.S.C. App. § 5(b)(1)(B) provides that "During times of war, the President may ... prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation, or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property with respect to which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States...."

*States v. Warren,* 612 F.2d 887, 890 (5th Cir.1980) (en banc) (31 U.S.C. §§ 1058, 1101(a)(1)(A), currency reporting statute); *United States v. Davis,* 583 F.2d 190, 194 (22 U.S.C. § 1934(c), munitions export statute); *United States v. Schnaiderman,* 568 F.2d 1208 (5th Cir.1978) (currency reporting statute); *United States v. Granda,* 565 F.2d 922, 924 (5th Cir.1978) (same).

■ The government must prove that appellants "had knowledge of [the restrictions] and acted with the specific intent to circumvent those requirements." *Granda,* 565 F.2d at 924. *See also United States v. Frade,* 709 F.2d 1387, 1391 (11th Cir.1983) (violation of TWEA requires that "the defendants are apprised of both the necessity for obtaining, and the possibility of obtaining, such a license"). Proof that the defendant negligently failed to investigate the regulations does not sufficiently prove requisite *mens rea. United States v. Adames,* 878 F.2d 1374, 1376 (11th Cir. 1989) (per curiam).

The government, however, need not show that appellants had knowledge of the specific regulations governing transactions with Vietnamese nationals. *Liparota v. United States,* 471 U.S. 419, 434, 105 S.Ct. 2084, 2092, 85 L.Ed.2d 434 (1985) (discussing proof of specific intent to commit food stamp fraud). The appellants cannot "avoid prosecution by claiming that [they] had not brushed up on the law." *Hamling v. United States,* 418 U.S. 87, 123, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974). Rather, the government must prove only that the defendants knew that their planned conduct was legally prohibited and that they therefore acted with an "evil-meaning mind." *Morissette v. United States,* 342 U.S. 246, 251, 72 S.Ct. 240, 243–44, 96 L.Ed. 288 (1952).

■ Moreover, the government is not confined to a direct proof of the requisite *mens rea.* Circumstantial proof of specific intent may suffice. *Liparota,* 471 U.S. at 434, 105 S.Ct. at 2092; *United States v. O'Banion,* 943 F.2d 1422, 1429 (5th Cir. 1991) (specific intent to violate currency reporting law). The jury may infer willful violation of a known legal obligation from "facts and circumstances surrounding the

case." *Liparota,* 471 U.S. at 434, 105 S.Ct. at 2092.

With these principles in mind, we have little difficulty in finding the evidence sufficient to show that Tooker, Scott, and De-Brophy acted with specific intent to violate regulations prohibiting unlicensed transactions with Vietnamese nationals.

A. *Evidence Showing Tooker's Specific Intent*

■ The jury could have concluded that Tooker was repeatedly warned that the transaction was illegal but responded with ways to conceal the illegality. For instance, Gessner warned Tooker that the transaction was against federal law on January 4, 1990, stating that "I think that it's against federal law to ... be negotiating this kind of deal." Tooker did not respond to this remark. Later at the same January 4 meeting, however, Tooker stated that Gessner could pay for the goods in question by using gold sold in Hong Kong, so that the "gold would not have to go to Vietnam." At the same January 24 meeting, Gessner asked Tang and Tooker whether he could avoid having his passport stamped "because of the, the federal laws that are being, uh, circumvented." Neither Tooker nor Tang contradicted this characterization of the transaction. Instead, Tang reassured Gessner that his passport would not have to be stamped. Tooker ended the January 24 meeting by stating to Tang and Gessner, "[y]ou and I don't talk about it, unless we're out in the open somewhere, where nobody around [sic]. The less contact, and, uh, uh, ... if you come out to the store, if you want to tell me something, you go outside."

Finally, a jury could infer the necessary culpability from Tooker's remarks on February 23. At this meeting, Gessner recalled a discussion with Tooker in which "we talked about this Trading with the Enemy Act" and stated that he was "a little concerned about it." Tooker reassured Gessner by noting that "on this rice, the way—the only way I know to work now is through, uh, Canada." Gessner asked whether "we could make it appear that everything in actual paperwork

actually ... went through the Canadian end of it and really insulate ourselves." Tooker replied, "right, right." He further noted that "your name and my name would never appear anywhere" and that "there's no ... just cash." Finally, in responding to a discussion about the different types of rice, Tooker stated that "my ultimate point is it's against the law in this country to do business with, uh, Vietnam, so we don't need to say Vietnamese rice." He further explained that he even told his wife that the rice came from Thailand.

A reasonable juror could infer from these conversations that Tooker knew the proposed deal was illegal and wanted to hide it to evade the law. Tooker makes much of the fact that he occasionally expressed scruples about violating real or imagined prohibitions on transactions concerning Vietnam. Tooker refused to sell weapons to Gessner; he also refused to visit Vietnam, stating erroneously that such a visit was illegal. Tooker also stated that "as far as I'm concerned we're not [dealing with Vietnam]" because "these planes have been going to Hong Kong or something." Finally, on April 13, Tooker told Gessner over the telephone that he did not want to do "anything wrong" and that the parties should "set up the transaction subject to the dropping of the sanctions."

However, Tooker did not state that he wanted to delay the transaction until April 13—several months after he had become involved in the negotiations. Before April, Tooker repeatedly indicated that he planned to go forward with the transaction by using deception to avoid prosecution under the law. The jury could have inferred from Tooker's sudden reluctance to do business that Tooker had become suspicious of Gessner and was attempting to protect himself from a potential informer.

Tooker's expressions of scruples before April 13 do not prevent a jury from finding that Tooker knew that the planned transaction was illegal. Tooker could be willing to violate the TWEA by sales of rice but be unwilling to sell narcotics and weapons. Tooker's statement that "I—I—I wouldn't do anything if I thought I'd get in trouble" does not bar the jury from finding that

Tooker intended to violate the law: the jury could have inferred that Tooker was only expressing a fear of being caught.

Finally, the jury could convict Tooker despite Gessner's failure, in Tooker's words, to "sit down with [Tooker] with a xerox copy of the [TWEA]" to explain the illegality of the proposed transaction. Contrary to Tooker's brief on appeal, the government need not read chapter and verse of the TWEA to Tooker to test his knowledge of illegality, as long as the "facts and circumstances surrounding the case" indicate that Tooker was willfully violating the TWEA. *Liparota*, 105 S.Ct. at 2092. The evidence at trial provided ample grounds for the jury's inference that Tooker committed such a willful violation.

### B. *Evidence Showing Scott's and DeBrophy's Specific Intent*

■ A reasonable juror could also conclude that Scott and DeBrophy intended to violate TWEA. As with Tooker, DeBrophy's statements support an inference that he was structuring the transaction to conceal its illegality. On February 22, when Gessner expressed uneasiness "about the fact that the, the origin on this is Vietnam," DeBrophy replied that this was "no problem," and DeBrophy later explained that "if the U.S. government don't like, uh, uh, Royal Columbia [registered in the United States] doing any business with the Vietnamese, we can get Royal Columbia registered in Columbia to do business."

At the meeting of February 23, when Tooker stated that "it is against the law in this country to do business with Vietnam," DeBrophy stated that "until relations are normalized, we still have to pretend." Scott likewise stated that "unless someone disturbs the State Department, no one is likely to get into trouble." These statements indicate that DeBrophy and Scott intended to use deception to go forward with the transaction, despite their professions that they would not sell rice until normalization.

Finally, we note that evidence suggested that Scott and DeBrophy were planning the sale of an immense quantity of rice from a

Vietnamese source. The evidence also suggested that both Scott and DeBrophy were well aware that Vietnamese rice was cheaper than "Basmati" rice, despite the fact that the different types of rice were essentially identical in quality. A reasonable jury could infer that both Scott and DeBrophy could not help but realize that Vietnamese rice's price was lower than the world market price because of economic sanctions against Vietnam preventing the normal sale of Vietnamese rice on the world market.

Both DeBrophy and Scott contend that, because Gessner's letter of intent to De-Brophy and Scott described an agreement to sell Gessner "Basmati rice," there is no evidence that either DeBrophy or Scott intended to sell Vietnamese rice in violation of the law. However, there was ample evidence that both DeBrophy and Scott were willing to sell Vietnamese as well as Basmati rice to Gessner. A reasonable juror could have inferred that Scott and De-Brophy intended to arrange the sale of rice from Vietnamese nationals or the Vietnamese government, knowing that such a transaction violated U.S. law.

### C. *Evidence Showing Bao Tran's Specific Intent*

The evidence concerning Bao Tran presents a closer question. Tran was in Vietnam during most of the period of the alleged conspiracy. Therefore, he was not present at any of the tape-recorded conversations during which Gessner and Tooker stated that the proposed transaction was illegal.

█ However, we find sufficient circumstantial evidence to support Bao Tran's conviction. The jury could have inferred from Bao Tran's surreptitious behavior, his extensive experience with Vietnamese trade, and the statement in a letter from Tran that he faced difficulty because of a "trade barrier," that Tran willfully disregarded regulations promulgated under TWEA in going forward with the rice transaction.

The jury could have inferred that Bao Tran was aware of the regulations prohibiting transactions involving property of Vietnam nationals from the sheer scale of Tran's involvement with the Vietnamese

trade and the circumstances surrounding that trade. Bao Tran was not an occasional participant in trade deals involving Vietnam. His firm Intercontinental Trading arranged large sales of Vietnamese rice throughout the world. The contract with Tedico Vina Dong Thap, for instance, involved the sale of 850,000 metric tons of Vietnamese rice to Intercontinental Trading. In other documents introduced by the government at trial, DeBrophy proposes the sale of Vietnamese rice to Peru, Libya, Nigeria, Spain, and Mexico in quantities ranging from 40,000 to 120,000 metric tons. Tang, Tran's partner, proposed sales of over 100,000 metric tons of rice to Gessner.

The government introduced evidence that Vietnamese rice was less expensive than other rice, despite the similarity of Vietnamese rice in quality to other sorts of rice. Both Scott and DeBrophy told Gessner that the price of Vietnamese rice was lower than rice from other source countries, despite their substantially identical quality. The jury could infer that Tran must have known that Vietnamese rice was cheaper in part because of the restrictions on its sale in the United States. It was reasonable to infer from Tran having arranged these sales that he knew why they were profitable—the prohibition on trade with Vietnam imposed by the United States. The jury could conclude that Tran not only knew of the sanctions imposed by the United States against transactions involving Vietnam, but also was knowingly exploiting a market created by the United States' sanctions.

This inference is made more reasonable by the evidence introduced at trial that Tran had an exclusive arrangement to purchase rice from the Vietnamese government. According to a fax from DeBrophy to a potential buyer of Vietnamese rice, "our man will be in Saigon next week and we have an exclusive on this price." The jury could reasonably have concluded that sellers of rice do not give exclusive rights to buyers so inexperienced in Vietnamese trade that they do not realize that the United States prohibits transactions involving the property of Vietnamese nationals.

There was evidence that Bao Tran knew that Vietnamese trade was regulated by

the United States. A document found on Bao Tran's word processor stated in Vietnamese that "Due to facing difficulty [sic] problems because of prohibition, I'm trying to resolve problems and it will be resolved in a few days." Bao Tran insists that the word "prohibition" ought to be translated as "trade barriers." However, this translation does little to support Tran's defense. The jury could infer from this document that Tran was speaking of the trade sanctions erected by the United States—surely the most significant trade barriers with which Tran would have had to deal.

Finally, Tran's efforts to conceal the transaction indicate that he knew the transaction was illegal. When Gessner asked whether his entry into Vietnam could be concealed on his passport, Tran replied that his passport need not show that he visited Vietnam. The jury could have inferred from Tran's complicity in concealing the links of the transaction with Vietnam that Tran knew that transactions involving Vietnam were illegal.

Tran relies heavily on the Eleventh Circuit's decision in *United States v. Frade,* 709 F.2d 1387, 1392 (11th Cir.1983) to support his contention that the evidence is insufficient to support the inference that he knew that the transaction with Gessner was illegal. However, *Frade* is different.

In *Frade,* several priests arranged for a chartered boat to travel to Cuba to transport Cuban refugees from Cuba to the United States during the famous Mariel boat lift. They were convicted after this expedition for violation of TWEA and 31 C.F.R. § 515.415(a), which prohibits transactions in connection to the transportation of any Cuban national lacking a visa to the United States. The Eleventh Circuit reversed the conviction of the priests on the ground that there was insufficient evidence to support a finding that they had specific intent to violate the statute or regulation.

The U.S. policy toward the evacuation of Cubans during the Mariel boatlift was in a state of flux when the priests organized their boatlift of Cubans. While President Carter had permitted 3,500 Cuban refugees camped in the Peruvian embassy to Cuba to enter the United States, President Carter also issued statements that "illegal" transportation of refugees would not be tolerated. The regulation that the priests were convicted of violating was not enacted until two months after the priests began planning the boatlift. *Frade,* 709 F.2d at 1389, 1395–96.

The Eleventh Circuit found that the priests "made extensive efforts, up to the time of their voyage, to discover and keep abreast of government policy toward the refugees." *Frade,* 709 F.2d at 1394. These efforts included meetings with the offices of two Senators and three representatives. Congresswoman Lindy Boggs testified at the priests' trial that the priests sought information as to whether the proposed trip to and from Cuba complied with U.S. policy. Congresswoman Boggs also testified that she believed that the United States was "encouraging and welcoming" the proposed boatlift, based on President Carter's statement on May 5, 1980 that "we'll continue to provide an open heart and open arms to refugees seeking freedom from Communist domination and economic deprivation...." *Frade,* 709 F.2d at 1394–95.

The priests also met with officials from the Justice Department, the INS, the White House (including the Press Secretary to President Carter, Jody Powell), and they asked the Senators and Congressmen with whom they met to "inform the President" of what they planned to do. Some of the officials with whom the priests met warned that the priests' boatlift might violate immigration laws, and some stated that, in light of President Carter's comments on May 14, 1980, the boatlift might be prohibited by U.S. policy. *Frade,* 709 F.2d at 1390.

However, the *Frade* court noted that the President's policy statement clearly warned against only the transportation of Cuban immigrants in unsafe ships and transportation of "undesirables"—drug addicts, criminals, etc.—to the United States. Because the priests had taken special care to ensure that no undesirables would be on their ship and to guarantee that their ship was safe and seaworthy, the *Frade* court concluded that the priests were not put on notice that

their proposed boatlift was illegal. *Frade*, 709 F.2d at 1396–97.

Crucial to the *Frade* court's holding was the fact that, when the priests planned the transportation of the Cubans to Florida, 31 C.F.R. § 515.415, the regulation under which they had been convicted, was not enacted or promulgated. The regulation was not effective until May 15, 1980, two months after the priests began to plan the evacuation of the refugees. Even after this regulation became effective, it was not published. Because the priests were in Cuba negotiating the release of the refugees when the regulation was announced by the Coast Guard, they were unable to hear the Coast Guard's radio broadcast, which were being "jammed and garbled by Cuba." *Frade*, 709 F.2d at 1294.

In short, the *Frade* court found that the priests had made extensive efforts to publicize their boatlift, had asked for advice as to the lifts' legality from government officials and legislators, and were not *able* to learn of the existence of the regulation that actually made their conduct illegal.

By contrast with the defendants in *Frade*, Tran did not act openly but surreptitiously. The price of rice, Tran's long experience with Vietnamese trade, and Tran's stated awareness that trade with Vietnam was subject to "barriers" allow a reasonable juror to conclude that Tran knew that the rice transactions that he was arranging were illegal. Finally, and most importantly, the regulations prohibiting the transaction arranged by Bao Tran were published and available for inspection.

AFFIRMED.

## ON PETITIONS FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

PER CURIAM:

Tooker, Bao Tran, Scott, and DeBrophy, appellants, all petition the court for a rehearing. The petitioners' arguments were all made in the original briefs to this court, and we reject them for the reasons stated in the panel opinion.

\* Editor's Note: The opinion has been corrected

Petitioners point out a transposition in the original panel opinion. The opinion states:

> "Both DeBrophy and Scott contend that, because *their* letter of intent to *Gessner* described an agreement to sell Gessner 'Basmati rice,' there is no evidence that either intended to sell Vietnamese rice in violation of the law.

*United States v. Tooker*, at 1216 (emphasis added). This passage transposed DeBrophy's and Scott's names with Gessner's. Accordingly, the sentence should be altered to read \*:

> "Both DeBrophy and Scott contend that, because Gessner's letter of intent to DeBrophy and Scott described an agreement to sell Gessner 'Basmati rice,' there is no evidence that either DeBrophy or Scott intended to sell Vietnamese rice in violation of the law."

This typographical error has no effect on the court's reasoning or result. The appellants' petition is meritless.

The court's opinion will be AMENDED as specified in this order. The petitions for rehearing are DENIED and no member of this panel nor judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Federal Rules of Appellate Procedure and Local Rule 35) the Suggestion for Rehearing En Banc is DENIED.

for bound volume publication.