**UNITED STATES of America, Plaintiff–Appellant, Cross–Appellee,**

v.

**Michael MACKO, Defendant–Appellee, Cross–Appellant,**

**Frank Van Ameringen, Defendant–Appellee.**

No. 90–5965.

United States Court of Appeals, Eleventh Circuit.

July 9, 1993.

Roberto Martinez, U.S. Atty., Paul E. Pelletier, Linda Collins Hertz, Lynne Lamprecht, Asst. U.S. Attys., Miami, FL, for appellant.

Kenneth Swartz, Richard C. Klugh, Asst. Federal Public Defenders, Miami, FL, for Frank Van Ameringen.

William A. Hough, Laws and Hough, Winston–Salem, NC, for Michael Macko.

Before COX, Circuit Judge, JOHNSON, Senior Circuit Judge, and KEHOE *, Senior District Judge.

COX, Circuit Judge:

The Government appeals a district court order acquitting Michael Macko and Frank Van Ameringen of charges that they violated the U.S. trade embargo against Cuba. Specifically, Macko and Van Ameringen were accused of selling cigarette-packaging machinery and supplies to Cuba in violation of the Trading with the Enemy Act of 1917, 50 U.S.C.App. § 5 (1988), and the Cuban Assets Control Regulations, 31 C.F.R. §§ 515.101–.901 (1992). The district court's order followed a trial at which a jury found the men guilty of the embargo violations and related charges. *See United States v. Ortiz de Zev-*

* Honorable James W. Kehoe, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

**1528**

*allos,* 748 F.Supp. 1569 (S.D.Fla.1990). The Government challenges the judgment of acquittal only with regard to the Cuban embargo violations. Macko cross-appeals the district court's refusal to sever his trial from that of Van Ameringen and a third codefendant. We affirm the denial of Macko's motions for a separate trial, reverse the judgment of acquittal on the Cuban embargo counts, reinstate the jury verdicts on those counts, and remand the case to the district court for sentencing.

## I. BACKGROUND

### A. *Procedural History*

A federal grand jury in the Southern District of Florida returned a six-count superseding indictment in December 1989 against Macko, Van Ameringen and Emilio Ortiz de Zevallos. The first count of the indictment charged the three men with violating the Trading with the Enemy Act (TWEA) and the Cuban Assets Control Regulations by selling a packaging machine to Cubans for use in a cigarette factory in Cuba. The second and third counts charged Macko and Ortiz de Zevallos with TWEA violations based on their additional shipments of machinery and supplies to Cuba. A fourth count charged all three with conspiring to export unlicensed items to Cuba in violation of the Export Administration Act (EAA), 50 U.S.C.App. § 2410(b) (1988). The final two counts charged Macko and Ortiz de Zevallos with making false statements on shipper's export declarations in violation of 18 U.S.C. § 1001 (1988).

In a pretrial motion for severance, Macko argued that evidence about his codefendants' post-arrest statements would violate Macko's rights under the Confrontation Clause of the Sixth Amendment. He contended that a severance was mandated under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The magistrate denied Macko's motion with the understanding that the Government would omit any references

to Macko in the codefendants' statements. Macko renewed his motion for severance three times during the trial. The district court denied each of the renewed motions.

Macko, Van Ameringen and Ortiz de Zevallos were tried together before a jury. The jury found Van Ameringen guilty of both charges against him, acquitted Macko and Ortiz de Zevallos on one false-statement count, and found Macko and Ortiz de Zevallos guilty on the other five counts. The district court subsequently held that the evidence was insufficient to support the guilty verdicts against Macko and Van Ameringen. *United States v. Ortiz de Zevallos,* 748 F.Supp. 1569, 1575, 1580 (S.D.Fla.1990). As an alternative basis for its holding on the TWEA counts, the court concluded that the appellees' conduct was not proscribed by the regulatory subsection under which they were charged. *Id.* at 1578–79. The court ordered the acquittal of Macko and Van Ameringen on all counts. *Id.* at 1581. Ortiz de Zevallos, however, fled the United States before the district court's hearing on the motions for acquittal. *Id.* at 1571 n. 1. In light of his fugitive status, the court did not address his motion. *Id.* Ortiz de Zevallos is not a party to the present appeal.[1]

### B. *Facts*

Because the district court ordered a judgment of acquittal based on the sufficiency of the evidence, our summary of the relevant facts gives the Government the benefit of "[a]ll reasonable inferences which tend to support the Government's case." *United States v. Burns,* 597 F.2d 939, 941 (5th Cir. 1979).[2] We resolve any conflicts in the evidence in the Government's favor. *Id.* "The same test applies whether the evidence is direct or circumstantial." *Id.*

■ Also, for purposes of our review it is significant that the district court deferred ruling on the defendants' initial motions for a judgment of acquittal. The defendants made their motions when the Government rested

---

**1.** Subsequent references in this opinion to the "defendants" refer only to Macko and Van Ameringen.

**2.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

its case-in-chief, but the district court did not rule until after the jury rendered its verdicts. Under the law of this circuit, the delay in ruling on the motions limits our review to the sufficiency of the evidence presented in the Government's case-in-chief. *See United States v. Rhodes,* 631 F.2d 43, 44–45 (5th Cir.1980) (holding that a trial court should not defer ruling on a motion for acquittal made at the close of the Government's case, but that "the error is harmless if the evidence presented in the Government's case-in-chief is sufficient to support the verdict"). Accordingly, while we view the evidence in a light favorable to the Government, we do not consider the evidence presented after the Government rested its case-in-chief.

The evidence presented during the Government's case-in-chief shows the following: Van Ameringen is a Florida attorney engaged in importing and exporting. During the spring or summer of 1988, Van Ameringen learned about a plan to manufacture counterfeit Winston cigarettes in Cuba for resale in European markets. He became involved in the project along with two Panamanian businessmen and Ortiz de Zevallos, a Peruvian national who was then operating a business out of Panama. Van Ameringen began looking for used packaging machines and someone with the technical expertise to install them. This search led him to Macko, a former engineer with R.J. Reynolds Tobacco Company (maker of Winston cigarettes).

Macko was then acquiring and exporting cigarette machinery through his own company, Machine Systems, Inc., in Winston–Salem, North Carolina. Van Ameringen wrote to another participant in the Cuban cigarette operation that Macko was willing to provide and install the machines "anywhere" for $56,000 and could "go south" immediately. (Gov't Exh. 77a.) Macko later agreed to cut his price to $39,000 in exchange for a share of the profits. He was to receive a quarter of the price up front plus his travel expenses. Macko, Van Ameringen and Ortiz de Zevallos went to Cuba, by way of Panama, in October 1988 for talks with Cuban officials about the cigarette factory.

Over the next several months Macko acquired the needed packaging machines and supplies. The supplies included "Winston Red" and "Winston Gold" printing ink, two colors specially blended to match the tints on Winston cigarette packaging. The machines and supplies went to Ortiz de Zevallos in Panama, and Ortiz de Zevallos forwarded them to Cuba. Macko returned to Cuba in March and May of 1989—again, by way of Panama. Ortiz de Zevallos wrote checks to Macko for $55,000, $42,000, $21,000, and $2,218. Macko wrote one $5,000 check to Van Ameringen, but the check was returned because of insufficient funds. One invoice under the letterhead of Macko's Machine Systems, Inc., itemized charges for $133,756 worth of equipment and supplies and was addressed to the attention of a Cuban government official at the Cuban embassy in Panama. The invoice, in an envelope bearing the logo of the Cuban Ministry of Interior, was found in Ortiz de Zevallos's briefcase when he was arrested at Miami International Airport.

The defendants took pains to conceal the true location of the cigarette factory. In his extensive correspondence with other participants in the plan, Van Ameringen avoided mentioning Cuba by name and instead referred to the country with such non-identifying terms as "the Island" or "that Sovereign Nation." (Gov't Exhs. 84, 101.) Macko told people who sold him machinery and supplies that the goods were going to Uruguay or to "some undeveloped country in South America." (R. 4 at 271; R. 5 at 367.) Macko and Ortiz de Zevallos instructed a freight forwarder with American Overseas Transport Corporation to send a shipment of goods to Panama "en transito." (R. 4 at 239–42.) When the freight forwarder asked about the goods' ultimate destination, she "never got ... a direct answer." (R. 4 at 241.) Instead, Macko and Ortiz de Zevallos told her to list Panama as the ultimate destination on the shipping documents. Macko and Van Ameringen also were circumspect in their travel to Cuba, stopping first in Panama. Before their October 28 trip to Cuba, Van Ameringen sent his and Macko's passport numbers to Ortiz de Zevallos for advance clearance by the Cuban embassy in Panama. Stamped travel information in the passports

shows the defendants' arrivals and departures in the United States and Panama, but not Cuba.

Van Ameringen was excluded from the Cuban project sometime in late 1988 or early 1989. At first he suspected that Ortiz de Zevallos may have pocketed the Cubans' money and abandoned the project. In January 1989, Van Ameringen sent letters to Cuban officials complaining about Ortiz de Zevallos and emphasizing Van Ameringen's desire to go ahead with the cigarette plan.

Macko gave false or misleading statements when U.S. Customs agents first asked him about the Cuban cigarette project. The agents interviewed Macko in November 1989 after they executed a search warrant at his office. Macko told the agents he had acquired a single packaging machine for someone in Panama. He first said he thought the machine was to be used to package bars of soap in Chile, then he said he understood that the machine was intended to wrap a "stationery size box" at a Colombian factory. (R. 6 at 464.) He said he had traveled to Panama three times, where he serviced the machine on a pallet. He denied installing the machine, and he said he never suspected that it was destined for Cuba. Although he said he was paid a total of $25,000 for the machine and parts, he could not explain a copy of a $55,000 check to him from Ortiz de Zevallos. He denied traveling to Cuba. He said a Cuban Airways baggage tag found in his wallet did not belong to him and may have been given to him by someone else as a souvenir.

Upon his arrest in December 1989, Van Ameringen denied trading with Cuba although he admitted talking to someone from Panama about the Cuban cigarette factory. He recalled going to Cuba in October 1988 with two other people and a machine for the cigarette factory. One of the participants in the transaction was planning to market the Cuban cigarettes through Chile to the Far East. Records found at Van Ameringen's home reflected his involvement in discussions about a number of other international transactions in goods. Asked whether he had tried to conceal the Cuban transaction, he replied: "I'm not going to say we shouted it from the rooftops." (R. 6 at 663.)

By the time the defendants became involved in the cigarette plan, the Cuban trade embargo had been in force and publicized for about twenty-five years. The U.S. Department of the Treasury frequently distributes information about embargoes to freight forwarders and import-export businesses, and travelers from the United States to Cuba receive brochures about the trade ban. At Macko's office and at Van Ameringen's residence, Customs agents saw copies of a Department of the Treasury brochure that mentions the Cuban embargo as it pertains to imports, although that particular brochure does not discuss exports to Cuba.

### C. The District Court's Order and Rulings

The jury found the Government's evidence sufficiently persuasive to convict the defendants, acquitting Macko of only one false-statement charge. After hearing additional arguments following the verdicts, however, the district court concluded that the evidence against Macko and Van Ameringen was insufficient as to all counts.

In its published order explaining the judgment of acquittal, the district court describes the Government's evidence as "primarily a paper case, made up of letters, faxes, shipping invoices, and other documents." *United States v. Ortiz de Zevallos*, 748 F.Supp. 1569, 1572 (S.D.Fla.1990). This "paper trail," the court states, "has too many twists and turns and dead ends to establish more than a tenuous inference that [Macko and Van Ameringen] acted with the requisite intention to violate either the TWEA or the EAA." *Id.* The district court recognizes that circumstantial evidence may establish specific intent to violate a statute or regulation. *Id.* at 1575. Nevertheless, the court observes that the circumstantial evidence against Macko and Van Ameringen "is susceptible to more than one interpretation." *Id.* The jury could reasonably infer that the defendants knew that their conduct was generally unlawful, the court says, but such a general awareness of illegality is not sufficient to establish guilt of a specific intent crime. *Id.* Only by "mere speculation" could a jury conclude that Macko and Van Ameringen actually knew of

the regulations promulgated pursuant to the TWEA and the EAA. *Id.* The court states that "[m]ere conjecture or speculation cannot sustain a determination of guilt." *Id.*

The district court also holds that the Government charged Macko and Van Ameringen under the wrong subsection of the Cuban Assets Control Regulations. *Id.* at 1579. Section 515.201 of the regulations provides, in pertinent part:

> (b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:
>
> (1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States ....
>
> ....
>
> (c) Any transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions set forth in paragraph ... (b) of this section is hereby prohibited.
>
> (d) For the purposes of this part, the term "foreign country designated under this part" and the term "designated foreign country" mean Cuba and the term "effective date" and the term "effective date of this section" mean with respect to Cuba, or any national thereof, 12:01 a.m., e.s.t., July 8, 1963.

31 C.F.R. § 515.201(b)–(d).

The indictment charged the defendants with violating the prohibition in § 515.-201(b)(1) against transactions with Cuba or Cuban nationals. The court, however, states that the defendants dealt only with Ortiz de Zevallos and "plainly did *not* trade with Cuba, Cuban nationals, or Cuban agents." *Ortiz de Zevallos,* 748 F.Supp. at 1579. If

any part of the regulation proscribes the defendants' conduct, it is the evasion language of subsection (c) rather than subsection (b)(1), the court concludes. *Id.* The indictment did not charge a violation of subsection (c).

Turning to the false-statement conviction, the district court sees insufficient evidence that Macko provided incorrect information for the shipper's export declaration. *Id.* at 1580. Macko and Ortiz de Zevallos told the freight forwarder that the goods were to be shipped to Panama in transit. *Id.* This indicated that the goods would subsequently be forwarded from Panama to another country. Thus, the district court reasons, although Macko may have "failed to reveal the entire truth concerning the destination of the shipment," he made no false statement. *Id.*

During the course of the trial, after denying Macko's renewed motions for a severance, the district court instructed the jury that the post-arrest statements of Ortiz de Zevallos and Van Ameringen were not to be considered as evidence against Macko. In addressing Macko's objections, the court concluded that Van Ameringen's redacted statement did not clearly refer to Macko.

## II. CONTENTIONS OF THE PARTIES

The Government appeals the judgment of acquittal as it pertains to the TWEA counts only. According to the Government, the evidence against Macko and Van Ameringen, though circumstantial, established that they were aware of the prohibitions of the Cuban trade embargo and that they acted with the specific intent to violate the embargo. The Government also maintains that 31 C.F.R. § 515.201(b)(1) proscribes the actions of Macko and Van Ameringen in acquiring machinery and supplies for the Cuban factory.

Macko and Van Ameringen argue that the Government's circumstantial evidence falls short of proving that the appellees realized they were violating the Cuban embargo by arranging to supply the factory. They agree with the district court's holding that their conduct could not have violated 31 C.F.R. § 515.201(b)(1). If subsection (b)(1) prohibits selling goods to Cuba by way of a third

country, they argue, then the language in subsection (c) about evasive transactions is redundant.

On the cross-appeal, Macko contends that the district court should have granted him a separate trial because testimony about his codefendants' post-arrest statements prejudiced him. He argues that substituting indefinite nouns or pronouns for direct references to Macko in the statements was insufficient to prevent them from implicating him in the minds of the jurors. The Government responds that the redacted statements did not directly implicate Macko in any illegal activity. Even if the court erred by admitting the statements, the Government contends that the error was harmless because of other evidence of Macko's guilt.

## III. ISSUES

The parties present three issues on this appeal and cross-appeal:

(1) Whether the district court erred in holding that the Government's evidence was insufficient for the jury to find beyond a reasonable doubt that Macko and Van Ameringen had the specific intent to violate the Cuban embargo.

(2) Whether the district court erred in holding that 31 C.F.R. § 515.201(b)(1) does not proscribe the defendants' conduct.

(3) Whether the district court abused its discretion in denying Macko's motions to sever.

## IV. DISCUSSION

### A. The Sufficiency of the Evidence

■ *1. Standard of Review.* The district court's determination that the evidence against Macko and Van Ameringen was insufficient to support the jury's guilty verdicts is a conclusion of law to which we accord no deference. *United States v. Adames*, 878 F.2d 1374, 1375 (11th Cir.1989); *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir.1989). We must conduct an independent review to decide whether the jury verdicts

rest on "'substantial evidence, taking the view most favorable to the government.'" *Adames*, 878 F.2d at 1375 (quoting *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). The test is whether a reasonable jury could find, beyond a reasonable doubt, that Macko and Van Ameringen are guilty of violating the TWEA. *See Sellers*, 871 F.2d at 1021. Nevertheless, "[t]he prosecution need not rebut all reasonable hypotheses other than guilt. The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury." *Id.* (citations omitted).

■ *2. Analysis.* Congress has authorized the President to declare and enforce comprehensive trade embargoes under certain circumstances. *See* TWEA, 50 U.S.C.App. § 5(b) (1988); *Regan v. Wald*, 468 U.S. 222, 225–29, 104 S.Ct. 3026, 3029–31, 82 L.Ed.2d 171 (1984). The Cuban Assets Control Regulations (the "regulations"), promulgated in 1963, establish such an embargo. *See* 31 C.F.R. §§ 515.101–.901 (1992); *Regan*, 468 U.S. at 226–27, 104 S.Ct. at 3029–30. Subject to narrow exceptions, the regulations prohibit all commercial transactions with Cuba or Cuban nationals. 31 C.F.R. § 515.-201(b); *United States v. Fuentes–Coba*, 738 F.2d 1191, 1193–94 (1984), *cert. denied*, 469 U.S. 1213, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985).

■ At the time Macko and Van Ameringen engaged in the activities at issue here, an individual who willfully violated the TWEA or the regulations faced a possible fine of up to $50,000 and imprisonment for as long as ten years. 50 U.S.C.App. § 16 (1988).[3] Because the regulations proscribe activity that is not generally perceived to be wrong, we have held that "willfulness" in this context requires a finding of specific intent to violate the trade provisions. *United States v. Frade*, 709 F.2d 1387, 1391–92 (11th Cir. 1983). To establish that Macko and Van

---

**3.** The possible fine for individuals has since been increased to $100,000. *See* 50 U.S.C.A.App.

§ 16(a) (West Supp.1993).

Ameringen acted with the requisite specific intent, the Government must prove that they actually knew of the prohibition against dealings with Cuba or Cuban nationals and deliberately violated it. *See id.* at 1392 ("[T]he regulatory provisions must be '*actually known*' and 'intentionally violated' for a crime to be committed.").

■ Circumstantial evidence may prove knowledge and intent. *United States v. Richards,* 638 F.2d 765, 768–69 (5th Cir. 1981), *cert. denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981). The district judge in this case correctly told the jury that "[t]he law makes no distinction between the weight you may give to either direct or circumstantial evidence." (R. 9 at 1392.) At another point in her instructions, the judge reminded the jury that it could consider "all the facts and circumstances surrounding the case" to determine whether Macko and Van Ameringen acted with specific intent to violate the TWEA. (R. 9 at 1405.) The defendants did not object to these instructions.

■ The facts and circumstances of this case, viewed in the light most favorable to the Government, show that Macko and Van Ameringen attempted to conceal the location of the cigarette factory. Macko actively misled his suppliers about the destination of equipment and goods, and he did not tell freight forwarders that Cuba was the final stop. He and Van Ameringen traveled to Cuba through Panama in a manner that left no reference to Cuba on their passports. Both were in possession of Department of the Treasury brochures that mention the Cuban embargo, albeit in relation to imports rather than exports. Macko initially lied to U.S. Customs agents about traveling and sending equipment to Cuba. Van Ameringen's correspondence about the project with other participants scrupulously avoided mentioning Cuba by name. Macko had experience in exporting machinery from the United States and Van Ameringen was involved in international sales of various goods. Also, their conduct occurred against the backdrop of a longstanding and widely publicized trade embargo against Cuba.

Van Ameringen contends that his "secretive or covert behavior [falls] short of evidence of actual knowledge of the specific regulations at issue." (Van Ameringen Br. at 10.) Such behavior may prove a general awareness of illegality but not specific intent, he says. (*Id.* at 11.) In other contexts, however, we have acknowledged that juries may consider devious conduct along with other circumstantial evidence to infer specific intent. For example, the defendant in *United States v. Rigdon,* 874 F.2d 774 (11th Cir.), *cert. denied,* 493 U.S. 958, 110 S.Ct. 374, 107 L.Ed.2d 360 (1989), was convicted of failing to file federal cash transaction reports (CTRs) for transactions involving $10,000 or more in currency. We held that, in addition to other evidence of the defendant's knowledge of the reporting requirement, "the jury could have inferred knowledge on Rigdon's part from the manipulative and shadowy nature of his structuring of the transactions." *Id.* at 778. In another CTR case, we observed that "the manner in which the [defendants] laundered the money out of the United States through their joint account . . . is also evidence from which the jury could infer guilty knowledge." *United States v. Hernando Ospina,* 798 F.2d 1570, 1581 (11th Cir.1986); *see also United States v. Tooker,* 957 F.2d 1209 (5th Cir.) (holding that in convicting a defendant of violating the U.S. embargo against Vietnam, the jury could have inferred from the defendant's "surreptitious behavior," his past experience and his vague mention of a "trade barrier" that he "willfully disregarded regulations promulgated under TWEA"), *cert. denied,* —— U.S. ——, 113 S.Ct. 148, 121 L.Ed.2d 100, *and cert. denied,* —— U.S. ——, 113 S.Ct. 172, 121 L.Ed.2d 119, *and cert. denied,* —— U.S. ——, 113 S.Ct. 187, 121 L.Ed.2d 131 (1992).

Macko and Van Ameringen cite a number of Eleventh Circuit cases that consider the quantum of evidence necessary to show specific intent. Of these, the defendants find *United States v. Adames,* 878 F.2d 1374 (11th Cir.1989), to be solidly on point. The facts in *Adames,* however, differ significantly from the present situation.

The defendant in *Adames* was a vice consul at the Panamanian consulate in Miami. She assisted in the shipment of weapons to Panama without first obtaining a munitions

export license mandated by the Arms Export Control Act (AECA), 22 U.S.C. § 2778 (1988 & Supp.1992). The district court in *Adames* granted the defendant an acquittal notwithstanding the jury's guilty verdict. We affirmed. *Adames,* 878 F.2d at 1377. We agreed that it was reasonable to infer from the defendant's "suspicious conduct" that she knew she was doing something illegal. *Id.* Nonetheless, this general impression of unlawfulness was not enough to establish that the defendant knew specifically that she needed licenses for the gun shipments and deliberately violated the regulation. *Id.*

Nothing in *Adames* indicates that the defendant had prior experience with exporting weapons from the United States. To the contrary, she became involved in the gun transactions only at the request of her brother. Further, the licensing requirements for firearms were not widely publicized, nor is there any indication that the defendant would have encountered the AECA regulations in her work at the Panamanian consulate. By contrast, Macko and Van Ameringen already were engaged in international sales and export activities. The Government presented testimony—which we must accept for this review—that the Cuban embargo has been widely publicized and that people in the import-export business are frequently apprised of it. Thus, the evidence against both Macko and Van Ameringen goes beyond the evidence against the defendant in *Adames.*

Macko and Van Ameringen also rely on our decision in another TWEA case, *United States v. Frade,* 709 F.2d 1387 (11th Cir. 1983). The defendants in *Frade* were two Episcopal priests who arranged for a ship to bring 402 Cuban refugees to the United States in 1980 during what became known as the Mariel boatlift.[4] While the priests were laying their plans, President Carter's administration attempted to gain some control over the sudden mass immigration by issuing a regulation that generally criminalized travel to or from Cuba in connection with the transportation of Cuban nationals. *Id.* at 1391 (discussing 31 C.F.R. § 515.415(a)). For ex-

ample, the regulation barred payments for port fees, lodging and meals. *Id.* The priests were convicted of violating the new regulation, and the district court denied their motion for judgment of acquittal. We reversed, holding that the evidence did not establish that the priests acted with specific intent to violate the regulation. *Id.* at 1397.

The case against Macko and Van Ameringen is more convincing than the case against the priests in *Frade.* Indeed, *Frade* recites considerable evidence that the priests did not know about the regulation at issue there. The regulation "was quietly promulgated, unexpected, and unannounced." *Id.* at 1391. It barred conduct that until then had been expressly authorized by a different section of the regulations. The new regulation had not been published by its effective date, and the priests were in Cuba when the Coast Guard began broadcasting announcements about it. Moreover, the Cuban government jammed the Coast Guard's radio broadcasts. Although U.S. officials warned the priests that their boatlift would be illegal, the officials "did not describe, refer to, or even hint at" the new provisions that outlawed specific activities incident to the priests' travel. *Id.* at 1393. As far as the priests knew from the officials' warnings, bringing Cubans to the United States may have been illegal only because of existing immigration or customs laws. Furthermore, the priests did not attempt to hide their travel to and from Cuba.

In this case, on the other hand, the trade ban in 31 C.F.R. § 515.201(b)(1) was promulgated neither quietly nor unexpectedly. It was in effect long before Macko and Van Ameringen involved themselves in the Cuban cigarette plan, and it was widely publicized. The regulation does not apply only to certain goods or activities but states a broad prohibition against transactions with Cuba or Cuban nationals.

We also find it telling that Macko and Van Ameringen actively concealed their travel to Cuba as well as the final destination of the cigarette machinery and supplies. They did not attempt to shield their contacts with

---

4. In the spring of 1980, about 114,000 Cuban refugees arrived in the United States aboard hundreds of boats during the course of the "freedom

flotilla" that originated at the Cuban harbor of Mariel. *Frade,* 709 F.2d at 1389.

Panama or Panamanians, nor did they hide the fact that they were acquiring cigarette-packaging machinery and supplies that included "Winston Red" and "Winston Gold" ink. The one aspect of the operation that they kept secret was the Cuban connection. A jury could reasonably conclude that the defendants' secrecy about this single fact resulted from their knowledge of the Cuban embargo.

The district court states that "[a] plausible interpretation of much of the evidence cited by the government, such as the fact that Defendants never traveled directly to Cuba and listed the destination of the goods as Panama, is that Defendants thought that it was illegal to deal directly with Cuba." *Ortiz de Zevallos*, 748 F.Supp. at 1575 n. 6. This finding seems to satisfy the knowledge element of specific intent. The district court adds, however, that even such a reasonable interpretation "does not advance the government's argument that Defendants believed it illegal to export goods bound for Cuba to Panama." *Id.* We take this to mean that the defendants did not deliberately violate the embargo because they did not realize that the regulations barred shipments to Cuba through a third country. Again, though, the jury could have reached a different conclusion based on the appellees' actions. If the defendants thought they could legally trade with Cuba by adding a third country to their shipping and travel routes, they had no reason to conceal their trips from Panama to Cuba or Cuba's status as the ultimate destination of the machinery and supplies. The district court reads too much significance into the goods' brief layover in Panama. The defendants acquired the machinery and supplies specifically for the Cuban factory and then shipped the goods intending that they go to Cuba. The particulars of the route that the goods followed are not decisive.

After reviewing the record in this case, we conclude that the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Macko and Van Ameringen knew about the Cuban trade embargo and deliberately violated it through their own conduct or by aiding and abetting other individuals. Consequently, the district court erred in granting Macko's and Van Ameringen's motions for a judgment of acquittal on the TWEA charges.

### B. The Applicable Regulation

██ *1. Standard of Review.* The court's holding that 31 C.F.R. § 515.201(b)(1) does not proscribe the defendants' conduct in providing equipment and goods for the Cuban cigarette factory is a question of law subject to plenary review. *Cf. United States v. Lawson*, 809 F.2d 1514, 1517 (11th Cir. 1987) (holding that whether a defendant is "properly prosecutable" under a particular statute "is a question of law subject to *de novo* review by this court").

*2. Analysis.* We hold that the court erred in determining that the defendants' conduct did not violate 31 C.F.R. § 515.201(b)(1). Macko and Van Ameringen traveled to Cuba and discussed the factory's needs with Cubans. Macko installed equipment at the Cuban factory. Van Ameringen wrote to Cuban government officials in Panama and in Cuba about the factory. Macko sent an invoice to the attention of a Cuban embassy official in Panama. In addition to their direct contacts with Cubans, the defendants worked in concert with Ortiz de Zevallos, who also dealt directly with the Cubans. As the district court noted, the defendants did not merely engage in an "arms' length transaction" with Ortiz de Zevallos. *Ortiz de Zevallos*, 748 F.Supp. at 1578. Macko and Van Ameringen "not only knew that Ortiz de Zevallos would ship the packaging machinery to Cuba but also *intended that the machinery go to Cuba.*" *Id.* at 1579 (emphasis added). The fact that the defendants attempted to conceal their activities by routing goods through Panama does not diminish the jury's conclusion that they engaged in "dealings" with Cubans within the meaning of § 515.201(b)(1).[5]

---

5. Because we conclude that § 515.201(b)(1) squarely applies to the appellees' conduct, we need not consider the scope of § 515.201(c), which targets transactions with the purpose or effect of avoiding the prohibitions in § 515.201(b).

**1536**

### C. The Denial of Macko's Motion to Sever

■ *1. Standard of Review.* We review the district court's refusal to sever Macko's trial for an abuse of discretion. *United States v. Lopez,* 898 F.2d 1505, 1510 (11th Cir.1990). To demonstrate that the district court abused its discretion, Macko "must show specific and compelling prejudice against which the trial court was unable to afford protection." *Id.*

■ *2. Analysis.* Macko has failed to demonstrate specific and compelling prejudice resulting from testimony about the post-arrest statements of his codefendants. The statements were redacted to substitute indefinite pronouns or nouns for Macko's name. As the district court pointed out, several other people were involved in the Cuban cigarette project. Therefore, general references to unnamed individuals in the statements did not clearly implicate Macko. The court also properly instructed the jury not to consider the codefendants' statements with regard to the case against Macko. The district court did not abuse its discretion in denying Macko's motions for severance.

### V. CONCLUSION

The court erred in ruling that the evidence was insufficient to support guilty verdicts against Macko and Van Ameringen on the Cuban embargo charges. The court also erred in holding that 31 C.F.R. § 515.-201(b)(1) does not proscribe the defendants' conduct even if the evidence is viewed from the Government's perspective. The district court did not abuse its discretion, however, in denying Macko a severance. We therefore AFFIRM the denial of the motions for a severance, REVERSE the judgment of acquittal on the Cuban embargo charges against Macko and Van Ameringen, REINSTATE the jury's guilty verdicts against both defendants on those charges, and REMAND the case to the district court for sentencing.

AFFIRMED in part, REVERSED in part and REMANDED.