Felix Justiz CEPERO, Petitioner,

v.

BOARD OF IMMIGRATION APPEALS, Respondent.

No. 92–3046–RDR.

United States District Court, D. Kansas.

March 31, 1995.

Felix Justiz Cepero, Three Rivers, TX, pro se.

Melanie D. Caro, Office of U.S. Atty., Topeka, KS, Emily A. Radford, and Lauri Steven Filppu, Office of Immigration Litigation, Civil Div., Frank W. Hunger, U.S. Dept. of Justice, Civil Div., Washington, DC, for Board of Immigration Appeals, William Barr, Atty. Gen., Ron Sanders, District Director.

## MEMORANDUM AND ORDER

ROGERS, Senior District Judge.

This matter is before the court on a petition for habeas corpus filed by a person detained under the authority of the Immigration and Naturalization Service ("INS"). Petitioner, a native of Cuba, seeks relief from a final order of exclusion and deportation issued by the Board of Immigration Appeals ("BIA"). The court has heard oral argument in this matter, and this action is now ripe for review. Having examined the record, the court makes the following findings and order.

*Factual Background*

Petitioner was born in Havana, Cuba, and served in the Cuban army from 1969 to 1972. Upon release from active duty, he enrolled in the University of Havana, where, as a student, he participated in a secret group opposing the Communist principles of the Cuban government. In November 1975, petitioner, still a military reservist, was ordered to fight in Angola. Upon his refusal, he was expelled from the University.

Petitioner was arrested in February 1976 on charges of disloyalty and conspiracy against the revolution. He was interrogated, beaten, and eventually transferred to a high security work camp. He later was transferred to a prison before being released in 1979. Due to conditions in Cuba, petitioner was unable to leave the country, and he was sent to a labor farm. In April 1980, petitioner, along with a number of others, sought refuge in the Peruvian Embassy in Havana.[1]

During this period, Castro essentially opened Cuban ports for emigration not only to members of the general public but to those housed in prisons and mental institutions, ultimately resulting in a flow of some 125,000 Cubans to American shores. Petitioner arrived in Florida in 1980 among this swell of immigrants, and was released on immigration parole shortly thereafter. He filed his initial application for asylum on May 3, 1980.

In 1982, plaintiff became involved in a bank robbery. He entered a guilty plea to a charge of aiding and abetting an armed robbery and was sentenced to twelve years. After serving seven years and four months, petitioner was released to INS custody.

During his detention, petitioner has successfully pursued academic and vocational programs, and he has maintained a clear disciplinary record for the last several years. A mental health evaluation conducted in April 1990 suggested petitioner was neither a danger to himself or others nor likely to become a burden to society.

In January 1991, the INS issued petitioner notice of a hearing which charged him with being excludable under 8 U.S.C. § 1182(a)(9) as an alien convicted of a crime of moral turpitude and under § 1182(a)(20) as an alien seeking entry without proper documentation.

---

1. "In early April 1980, some 10,800 Cuban citizens claiming status as political refugees sought sanctuary in the Peruvian Embassy in Havana. On April 14, 1980, President Carter declared that, pursuant to the Refugee Act of 1980, up to 3,500 of these refugees would be admitted into the United States. He allocated up to $4.25 million for their resettlement. 45 Fed.Reg. 28079 (April 28, 1980). An airlift was started but within three days Castro stopped the flights, announcing that anyone who wanted to leave could do so through the harbor at Mariel. Almost immediately, small boats, funded by members of the Cuban–American community, began leaving Key West." *United States v. Frade,* 709 F.2d 1387, 1389 (11th Cir.1983).

At the hearing, the Immigration Judge found petitioner excludable under both grounds charged. After considering petitioner's testimony, the Immigration Judge found petitioner had shown a well-founded fear of torture or death if forced to return to Cuba and found him eligible for both asylum and withholding of deportation. On administrative appeal, the Board of Immigration Appeals determined petitioner had been convicted of a "particularly serious crime" and was therefore barred from asylum. Accordingly, the BIA reversed the relief granted by the Immigration Judge and ordered petitioner deported to Cuba. This petition for habeas corpus relief followed.[2]

## Discussion

Petitioner's claims for relief must be evaluated against the background of developments in immigration regulation and procedure in recent years.

■■■ An alien in deportation or exclusion proceedings has two primary avenues for relief: asylum and withholding of deportation. A grant of asylum permits an alien to remain in the United States. *See* 8 U.S.C. § 1158. To qualify for asylum, an alien must demonstrate a "well-founded fear of persecution" if returned to his country of origin. *See id.;* 8 U.S.C. § 1101(a)(42)(A). In contrast, withholding of deportation is a remedy which prevents an alien from return to a particular country but does not bar deportation to a third country where the alien would not face persecution. *See* 8 U.S.C. § 1253(h). However, withholding of deportation will not be granted where the Attorney General finds "the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1253(h)(2)(B).

Before 1980, the United States Attorney General had discretionary authority under 8 U.S.C. § 1253(h) to withhold the deportation of an alien subject to persecution in the receiving nation due to race, religion, or political opinion. In 1980, Congress passed comprehensive refugee legislation with the Refugee Act of 1980, amending § 1253(h) to harmonize its contents with the principle of *nonrefoulement* embodied in Article 33 of the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223 (1968).[3] Article 33 of the Convention provides first, that no contracting state shall expel or return ("refouler") a refugee to territories where his life or freedom is jeopardized on the basis of race, religion, nationality, group affiliation, or political opinion, and second, that the benefit of *nonrefoulement* shall not extend to one who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the country.

Following the enactment of the Refugee Act of 1980, the BIA's interpretation of "particularly serious" crimes was essentially the result of case-by-case analysis, involving several factors, including "whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *In re Frentescu*, 18 I & N Dec. 244, 247 (1982). However, when the crime committed by an alien was determined to be particularly serious, the BIA did not interpret § 1253(h) to require a separate finding the alien constituted a danger to the community. *In re Carballe*, 19 I & N Dec. 357 (1986).

The Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978, 5053 (1990), however, supplanted the *Frentescu* approach by amending § 1253(h) to establish that an alien convicted of an aggravated felony shall be deemed to have committed a particularly serious crime, thus imposing significant new limitations on the availability of remedies for aliens convicted of certain crimes in the United States. Specifically, the 1990 Act provides that "[a]n alien who has been convicted

**2.** Jurisdiction for this action is based upon 8 U.S.C. § 1105a(b), which states:

Notwithstanding the provisions of any other law, any alien against whom a final order of exclusion has been made ... under the provisions of section 1226 of this title or comparable provisions of any prior Act may obtain judicial review of such order by habeas corpus proceedings and not otherwise.

**3.** Parties to the Protocol are bound to the provisions of Articles 2–34 of the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150. The United States acceded to the Protocol in 1968.

of an aggravated felony ... may not apply for or be granted asylum." 8 U.S.C. § 1158(d). A 1990 amendment to § 1253 also limited the withholding of deportation by providing that an alien convicted of an aggravated felony shall be deemed to have committed a particularly serious crime, a circumstance which precludes relief. 8 U.S.C. § 1253(h)(2).

*Petitioner's claims*

The petitioner's arguments, which have been raised both in the record and at oral argument, are, essentially, (1) the BIA erred in denying him asylum and withholding of deportation solely on the basis of his criminal conviction, without an individualized examination of the circumstances; (2) the BIA erred in finding petitioner committed a particularly serious crime; (3) the BIA erred in applying its 1990 regulations to petitioner's application for asylum filed in 1980; and (4) petitioner has a colorable claim of refugee status under the April 14, 1980, declaration of President Carter, and therefore should have been admitted as a refugee. The court will address these claims in turn.

*Denial based on criminal conviction*

Petitioner asserts the BIA erred in denying his requests for asylum or withholding of deportation by failing to give individualized consideration to the circumstances of his crime in its determination that the crime was particularly serious. He contends the applicable statutory provisions [4] require a two-part analysis, first, whether the crime committed was a particularly serious offense, and second, whether the alien, as a result, presents a danger to the community.

The United States Court of Appeals for the Tenth Circuit recently considered the appropriate interpretation of § 1253(h)(2)(B) and determined that an aggravated felony conviction creates an abso-

lute bar to withholding of deportation and removes the need for a separate finding of danger to the community. In *Al–Salehi v. INS*, 47 F.3d 390 (10th Cir.) the Court of Appeals considered and rejected many of the arguments presented to the court in the present action, namely, the statutory language, the structure of the statutory scheme and the disparate treatment of asylum, the legislative history of the 1990 amendments, and the treaty obligations of the United States. 47 F.3d at 393–95. The Tenth Circuit's conclusion that the interpretation of the BIA, which found in that case the petitioner's conviction of an aggravated felony was sufficient to foreclose the withholding of deportation without an additional finding of dangerousness, was appropriate and that "the legislative history accompanying the Refugee Act of 1980 indicates Congress explicitly intended the construction imposed on § 1253(h)(2)(B) by the BIA and these courts" appears to be dispositive of the petitioner's arguments in this matter concerning the appropriate analysis of a request for asylum or withholding of deportation by an alien convicted of a particularly serious crime. *Id.* 47 F.3d at 394 n. 4. The court therefore finds no error in the BIA's evaluation of the effect of petitioner's crime.

*BIA's interpretation of "particularly serious crime"*

Petitioner next contends the BIA erred in determining he committed a particularly serious crime. Petitioner entered a guilty plea to the third count of a three count indictment which charged:

> On or about the 13th day of August 1982, in the State and district of Maryland, Omar Vazquez del Rosario, Felix Justiz, Reynaldo Molina–Lopez in committing the offenses charged in the first two counts of

---

**4.** 8 U.S.C. § 1253(h) provides, in relevant part, as follows:

(h) **Withholding of deportation or return**
(1) The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

(2) Paragraph (1) shall not apply to any alien if the Attorney General determines that ... (B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States.
8 U.S.C. § 1158(d) provides:
(d) **Aliens convicted of aggravated felony.** An alien who has been convicted of an aggravated felony ... may not apply for or be granted asylum.

this indictment, did assault Robin Shifflett, David Roberts, Leslie Clark, and Gary Slocum, and other bank employees and customers, by pointing handguns and a knife at them and in their direction, said persons being in the Equitable Trust Company, 16575 S. Frederick Avenue, Gaithersburg, Maryland, a bank the deposits of which were then insured by the Federal Deposit Insurance Corporation. (AR 311)

As a result of the guilty plea, the United States Attorney declined to prosecute the remaining counts, which charged petitioner and the other perpetrators with the theft of over $11,000.00 by "force, violence and intimidation." *Id.* At the hearing before the Immigration Judge held in 1991 at the United States Penitentiary, Leavenworth, petitioner admitted his participation in the robbery, that the other participants had guns, and that he had moved into the teller area and gathered the currency. He disputed portions of the criminal record which suggested he was armed with a knife during the robbery.

After considering the record and testimony, the Immigration Judge found the petitioner was excludable but determined the conviction did not represent a particularly serious crime. (AR 114). As a result, the Immigration Judge issued an oral decision finding petitioner should be granted both asylum and withholding of deportation. On appeal, the BIA, while sustaining the appeal on the ground that asylum was inappropriately granted, ruled that the grant of withholding of deportation was not an accurate depiction of the Immigration Judge's decision and found that portion of the decision a nullity. (AR 2). Despite this, the BIA went on to find petitioner ineligible for both asylum and withholding of deportation. (AR 7).

■ Generally, in reviewing an agency's interpretation of a statute, where Congress has spoken clearly, a court must give effect to the unambiguous legislative intent. However, where Congress has not spoken clearly, the agency's interpretation is entitled to some deference, and must stand if its construction of the statute is a permissible one. *Al–Salehi,* 47 F.3d at 392; *Rubio–Rubio v. I.N.S.,* 23 F.3d 273, 276 (10th Cir.1994).

Thus, because the phrase "particularly serious crime" is not defined in the statute, review of the BIA's evaluation of the crime committed by petitioner must be given deference.

■ Here, the bank robbery in which petitioner participated was a felony offense in which petitioner acknowledges his accomplices were armed with guns. The robbery occurred in the presence of bank employees and customers, who were placed in the apprehension of imminent harm. Petitioner received a significant prison term for his participation in the crime. Under the deferential standard of review applicable in this action, the court finds no error in the BIA's determination the robbery constituted a particularly serious crime. *See In re Carballe,* 19 I & N Dec. 357 (BIA 1986) (discussing robbery convictions by Cuban alien who sought refuge in Peruvian Embassy).

*Processing of application for asylum*

■ Petitioner contends the BIA erred in applying the 1990 regulations to his application for asylum submitted in 1980, immediately after his arrival, rather than the regulations in effect at the time.

The current regulations, effective October 1, 1990, provide that "[a]ny previously filed but unadjudicated asylum application must be resubmitted by the alien to the Immigration Judge." 8 C.F.R. § 208.2(b). This practice of requiring resubmission of unadjudicated applications has been upheld. *Silwany–Rodriguez v. INS,* 975 F.2d 1157 (5th Cir.1992).

In *Silwany–Rodriguez,* the court reviewed the BIA's ruling, in *Matter of B—,* Interim Decision (BIA) 3164 (1991 WL 353531), that a subsequent filing of an application with an immigration judge requires the application to be evaluated under the current regulations. The BIA, noting the initial system of interim regulations and the express intent to implement permanent procedures after a period of experience and review, found adjudication under the current regulations served the purpose of the statutory scheme to remove eligibility for asylum for aliens convicted of aggravated felonies or particularly serious

crimes, while a contrary result would make asylum available to aliens convicted of crimes for a number of years despite the current regulations.

The court agrees the BIA's interpretation of the regulatory scheme is reasonable, and therefore, under the deferential standard of review which applies to agency interpretation, the BIA's reading must be upheld.

*Petitioner's claim of refugee status*

█ Finally, petitioner contends he has a colorable claim to refugee status.

At the time of the petitioner's move to sanctuary in the Peruvian Embassy, President Carter issued a statement that those in the Embassy "who otherwise qualify may be considered refugees even though they are within their countries of nationality or habitual residents." [5] Petitioner testified credibly before this court that he came to the United States in reliance on this declaration.

While a review of the statement issued by President Carter clearly indicates petitioner was within a group identified as eligible for refugee status, there is no evidence before the court which suggests petitioner was among those ultimately awarded refugee status. The record is simply silent on this point.

Likewise, at the hearing in this matter, petitioner's identification as an individual subject to the 1984 agreement between the United States and Cuba for the repatriation of certain Cuban citizens was a subject of dispute between the parties.

Therefore, in view of the likelihood of persecution if petitioner is forcibly returned to Cuba, his apparent qualification for refugee status at the time of his departure from Cuba, the confused circumstances at the time of petitioner's arrival on American soil, and the availability of counsel to assist petitioner in future proceedings, the court finds it in the interest of justice to remand this matter to immigration authorities for further administrative proceedings to determine whether petitioner's claims on these issues might entitle him to relief.

*Conclusion*

For the reasons set forth, the court concludes petitioner is not entitled to relief on the grounds the BIA determined his conviction of aiding and abetting an armed robbery precludes him from certain relief and applied its 1990 regulations to his application for asylum. Nevertheless, because of unresolved questions concerning petitioner's claim

---

5. President Carter issued the following statement concerning those in the Peruvian Embassy:

Presidential Determination No. 80–16 of April 14, 1980
Specification pursuant to Section 101(a)(42) of the Immigration and Nationality Act (INA), as amended, and Determination pursuant to Sections 2(b)(2) and 2(c)(1) of the Migration and Refugee Assistance Act of 1962, as amended (the "Act"), authorizing the obligation of $4,250,000 in funds
Memorandum for the Secretary of State
Pursuant to Section 101(a)(42) of the INA as amended, I hereby determine, after appropriate consultation with the Congress, that special circumstances exist such that persons who have taken sanctuary in the Peruvian Embassy in Havana who otherwise qualify may be considered refugees even though they are still within their country of nationality or habitual residence. Pursuant to Section 207(b) of the INA as amended, I determine that an unforeseen emergency refugee situation exists, that the admission in response to the emergency refugee situation of the 25 to 33 percent of the persons who have taken sanctuary at the Peruvian Embassy in Havana, up to a maximum of 3,500 refugees, is

justified by grave humanitarian concerns and is otherwise in the national interest, and that the admission to the United States of these refugees cannot be accomplished under subsection 207(a) of the INA.
In order to respond to the urgent humanitarian needs of those people in cuba who have taken sanctuary at the Peruvian Embassy in Havana, I hereby determine pursuant to Section 2(b)(2) of the Act that it is in the foreign policy interests of the United States to designate such persons at this Peruvian Embassy as a class of refugees eligible for assistance under the Act. Pursuant to Section 2(c)(1) of the Act, I hereby determine that it is important to the national interest that up to $4,250,000 in funds appropriated under the United State Emergency Refugee and Migration Assistance fund be made available to aid in the resettlement of these refugees.
The Secretary is requested to inform the appropriate committees of the congress of this determination and the obligation of funds under this authority.
This Determination shall be published in the Federal Register.
　/s/ Jimmy Carter
THE WHITE HOUSE
Washington, April 14, 1980.

of refugee status as a person seeking asylum in the Peruvian Embassy and whether petitioner is in fact subject to repatriation under the 1984 agreement, the court remands this matter for evaluation of these issues.

IT IS THEREFORE ORDERED the petition for habeas corpus is granted and this matter remanded to the Immigration and Naturalization Service for further proceedings as set forth herein.